**ILLINOIS HOSPITAL ASSOCIATION, et al., Plaintiffs,**

**v.**

**ILLINOIS DEPARTMENT OF PUBLIC AID, et al., Defendants.**

No. 83 C 5531.

United States District Court,
N.D. Illinois, E.D.

Dec. 6, 1983.

---

Lawrence A. Manson and Dorothy J. Voss, Wood, Lucksinger & Epstein, Chicago, Ill., for plaintiffs.

James C. O'Connell and Owen M. Field, Ill. Sp. Asst. Attys. Gen., Neil F. Hartigan, Ill. Atty. Gen., George J. Lynch, Burke, Griffin, Chomicz & Weinke, Chicago, Ill., for defendants.

SHADUR, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This action has been brought by (1) Illinois Hospital Association ("Association") on behalf of its 243 member hospitals, (2) nine hospitals and (3) two Medicaid recipients against Illinois Department of Public Aid and its Director Jeffrey Miller (collectively "IDPA"). Plaintiffs then moved for a preliminary injunction. After all parties had filed memoranda dealing with a number of issues posed by the Complaint and the preliminary injunction motion, this Court inquired whether any further submissions (either evidentiary or documentary in nature) would be necessary to permit decision of the limited preliminary injunction issue dealt with in the following findings of fact ("Findings") and conclusions of law ("Conclusions").[1]

All parties agreed (1) no additional submissions were required for that purpose and (2) their prior-documentary filings should constitute the record to be considered by this Court. In accordance with Fed.R.Civ.P. ("Rule") 52(a), this Court makes the following Findings and Conclusions based on the evidence now in the record:

### Findings of Fact ("Findings")

1. Association and the other plaintiffs already referred to[2] have brought this action against IDPA for declaratory and injunctive relief under 42 U.S.C. § 1983 ("Section 1983"), claiming IDPA's payment rates for inpatient hospital services violate the federal Medicaid Act ("Act"),[3] Sections 1396a(a)(13)(A) and 1396a(a)(30), and implementing regulations at 42 C.F.R. § 447.-250–.257.

### Medicaid Programs: The Applicable Standards

2. Illinois participates in the Medicaid program, a cooperative federal-state pro-

---

1. Plaintiffs' Complaint also asserts the inpatient and outpatient payment methodologies adopted by IDPA for fiscal year 1984 violate the Medicaid Act, but those allegations and related counts are still under consideration by this Court. These Findings and Conclusions concern only the inpatient payment rate issue described more fully in the text.

2. Because intervenor Hospital of Englewood ("Englewood") and IDPA reached an agreement at the time Englewood moved for a temporary restraining order at the commencement of this action, these Findings and Conclusions do not apply to grant relief to Englewood (although pre-agreement facts relating to Englewood are included as relevant to the issues dealt with in this order).

3. In total the Act's provisions constitute Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 to 1396p. Citations to the Act will simply take the form "Section—," reflecting the numbering in Title 42 rather than the internal numbering in the Act itself.

gram established by the Act under which federal funds are provided to states to furnish medical assistance (including hospital inpatient and outpatient services) to persons "whose income and resources are insufficient to meet the costs of necessary medical services" (Section 1396). Pursuant to the statutory formula, the United States provides roughly matching funds to states participating in the program.

3. IDPA administers and supervises the Illinois Medicaid program pursuant to Section 1396a(a)(5) and Ill.Rev.Stat. ch. 23, §§ 1–1, 6–1 *et seq.* and 12–1. Plaintiff hospitals and substantially all of IHA's member hospitals participate in the Illinois Medicaid program and provide a broad range of inpatient and outpatient services to Medicaid beneficiaries.

4. There is no requirement that a state participate in the Medicaid program. If a state elects to do so, however, it must comply with all requirements of the Act and the implementing regulations.[4]

5. Under Section 1396b(b) a state becomes eligible to participate in the Medicaid program, and to receive federal matching funds, by submitting to the Secretary (the "Secretary") of the United States Department of Health and Human Services ("HHS") a State Medicaid Plan that meets federal standards prescribed in the Act and its implementing regulations, and by having that plan approved by the Secretary. Any state desiring to make a significant change in an approved State Medicaid Plan must submit that amendment to the Secretary and obtain approval of the proposed change. Section 1396c; 45 C.F.R. §§ 201.3, 205.5(a).

6. Before October 1, 1981 Section 1396a(a)(13)(D) required states to reimburse hospitals their "reasonable costs" of providing covered hospital services to eligible Medicaid recipients. That "reasonable costs" criterion tracked the reimbursement standard used by the federal government

in the administration of Title XVIII of the Social Security Act (the "Medicare program"). Effective October 1, 1981 that provision was repealed and the Act was amended to allow states participating in the Medicaid program to reimburse hospitals for services provided to Medicaid beneficiaries at rates "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable state and federal laws, regulations, and quality and safety standards...." Section 1396a(a)(13)(A). According to the Senate Report that accompanied that amendment, S.Rep. No. 97–139, 97th Cong., 1st Sess. 478 (1981) (emphasis added):

> The flexibility given the states is *not intended to encourage arbitrary reductions in payment* that would adversely affect the quality of care.

7. Section 1396a(a)(30) (emphasis added) requires that state plans "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services and *to assure that payments are consistent with efficiency and economy, and quality of care.*" Section 1396a(a)(23) provides for Medicaid recipients' freedom of choice in the selection and use of health care providers. To that end, regulations provide Medicaid reimbursement levels shall be sufficient to enlist enough providers so that services are available to Medicaid recipients "at least to the extent that those services are available to the general population." 42 C.F.R. § 447.204.

*Illinois' Medicaid Program*

8. During fiscal years 1982 and 1983[5] the Illinois General Assembly and IDPA developed and implemented Medicaid inpatient reimbursement methodologies and in-

---

**4.** *Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980); *Smith v. Miller,* 665 F.2d 172, 175 (7th Cir.1981).

**5.** Illinois' fiscal year ends June 30. Accordingly the term "fiscal year 1983," for example, refers to the 12-month period that began July 1, 1982 and ended June 30, 1983.

patient rates under the new standard described in Findings 6 and 7. Under the reimbursement methodologies used by IDPA for fiscal years 1982 and 1983 hospitals were paid interim rates *during* those years, but by statute a reconciliation adjustment was mandated following year-end so that each hospital's overall Medicaid reimbursement was brought up to the final rate level IDPA had calculated. Ill.Rev. Stat. ch. 23, §§ 5–5.9 to –5.11 (Supp.1982).

9. On April 1, 1983 IDPA published Notices of Proposed Rulemaking for rules to become effective July 1, 1983. Those rules proposed a methodology to set reimbursement rates for fiscal year 1984 for hospital inpatient, outpatient and clinic services rendered by participating hospitals on or after July 1, 1983 to Medicaid (as well as the state-funded medical assistance programs) recipients. Those rules no longer provided for the interim-rate-plus-reconciliation-adjustment combination referred to in Finding 8, but rather for the setting of a single final rate (the "Final Rate") complying with the federal standard set by Section 1396a(a)(13)(A). 7 Ill.Regs. 3364–81, 3388–95 (April 1, 1983). Those rules were subsequently adopted as proposed. 7 Ill.Regs. 8271–8307, 8399 (July 15, 1983); 89 Ill.Admin.Code ch. I, §§ 140.116–.117, 140.-360–.375, 140.380.

10. While the fiscal year 1984 budget was being debated in the Illinois General Assembly, IDPA issued a June 13, 1983 "Urgent Notice" to Medicaid providers summarizing the changes in the Medical Assistance Programs that would occur "in the event that the Governor's (no tax increase) budget is adopted." [6] Pl.Mem. Ex.H.

11. On June 14, 1983 IDPA issued a second "Urgent Notice" to hospital providers, explaining IDPA's proposed inpatient reimbursement methodology for fiscal year 1984 and apprising providers as to "the best current information as to what revenue [they are] likely to receive from Public Aid with or without a tax increase." Pl. Mem.Ex.I at 1. IDPA explained the inpatient reimbursement methodology used to compute each hospital's Final Rates and stated (*id.* at 2):

> Insufficient funds are available to pay the full final reimbursement rate during fiscal year 1984. Without a tax increase, it will be necessary to defer 23.5 percent of the final reimbursement rate into later years.

12. Consequently IDPA notified the hospital providers (*id.* at 1) they would be paid at lesser so-called "interim rates," which would be calculated to stay within the amount ultimately appropriated by the legislature. Thus IDPA anticipated a state budget shortfall that would preclude IDPA from paying hospitals their Final Rates, and it promulgated a "shortfall rule" to deal with that expected result (89 Ill.Admin.Code ch. I, § 140.371) (emphasis added)):

> The Department will pay the final rates calculated in Section 140.365–140.370 which represent historical costs updated to the midpoint of the rate year, subject to available funds in the rate year. *To the extent that sufficient funds are not available, the Department will defer the unaffordable portion of the rates into later years, subject to the availability of funds in those years, and will reimburse hospitals during the rate year at interim payment rates.* These interim payment rates will equal the final rates adjusted according to the proportion of available funds to funds necessary to provide for payments at the final rates.

Accordingly, for fiscal year 1984 hospitals were assured of payment only at those lower rates ("Shortfall Rates") rather than at the Final Rates IDPA determined were necessary to conform to the statutory man-

---

**6.** Such changes included the total elimination of coverage of dental, optometric, podiatric and chiropractic services, termination of funding for the GA and AMI programs, and continuation of the 7.5% payment reductions implemented under the 1983 Emergency Budget Act.

date under its own rate-setting methodology.[7]

13. On July 5, 1983 the Illinois General Assembly appropriated $543.9 million for hospital inpatient services during 1984. P.A. 83-23. IDPA's own inpatient reimbursement methodology necessitated an appropriation of $690.9 million to make current payment to hospitals of their Act-mandated Final Rates under IDPA's new system (IDPA Mem. 12). Consequently there was an appropriation shortfall of $147 million.[8] Illinois' total appropriation for inpatient services rendered during fiscal year 1983 was $692 million. *Id.* Thus the assured fiscal year 1984 inpatient services funding is 22% less than the actual funding for those services in fiscal year 1983. This is so despite the fact inflation from fiscal year 1983 to fiscal year 1984, based on IDPA's own inflation index, was 7.1%. Pl. Mem.L, ¶ 9.

14. Based on evidence produced for the preliminary injunction hearing,[9] the following chart presents the loss that will be experienced by eight of the plaintiff hospitals in receiving their Shortfall Rates rather than their Final Rates during fiscal year 1984:

| Hospital | A 1984 Final Rate | B 1984 Shortfall Rate | C Difference (A–B) | D Utilization Cap [10] | E Shortfall Loss (CxD) |
|---|---|---|---|---|---|
| Chicago Osteopathic | 488.96 | 374.30 | 114.66 | 29,167 | $3,344,288 |
| Loyola | 417.63 | 319.70 | 97.93 | 11,991 | 1,174,279 |
| Mary Thompson | 343.77 | 263.15 | 80.62 | 18,177 | 1,465,430 |
| Mount Sinai | 417.63 | 319.70 | 97.93 | 35,740 | 3,500,018 |
| St. Bernard | 325.26 | 248.99 | 76.27 | 22,352 | 1,704,787 |
| St. Mary's | 242.54 | 185.67 | 56.87 | 33,907 | 1,928,291 |
| St. Francis | 367.67 | 281.45 | 86.22 | 19,579 | 1,688,101 |
| Victory Memorial | 331.83 | 254.02 | 77.81 | 5,987 | 465,848 |

Additional evidence from 81 Illinois hospitals also reveals their losses caused by the Shortfall Rates as compared with the Final Rates. *See* Pl.Mem. Vol. 3. Of those 81 hospitals, 18 will suffer losses of over $1 million each, solely due to the Shortfall Rates.

15. IDPA's payment of Shortfall Rates to Illinois hospitals has caused and is causing many such hospitals substantial, immediate and irreparable harm:

7. It should be emphasized that:

1. IDPA itself had determined the Final Rates were necessary to satisfy the Section 1396a(a)(13)(A) statutory test ("reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities...").

2. IDPA's "shortfall rule" gave the hospital providers no assurance they would *ever* receive those Final Rates. IDPA's determination of Final Rates was thus a wholly empty promise—or more accurately no promise at all.

8. Association has calculated the shortfall amount as approximately $159.7 million. However, because IDPA itself cited the $147 million figure during the legislative session, that amount is used in these Findings in the interests of being conservative—that is, giving IDPA the benefit of every doubt. Pl.Mem.Ex.K. Based on the differences between hospitals' Shortfall and Final Rates, the shortfall amount could be as much as $163.78 million. *See* IDPA Mem. Ex.J at 2.

9. Again in the interests of being conservative (see n. 8), this Finding has listed (only arguendo) the lower figures submitted in IDPA's final Mem. 6 rather than plaintiffs' higher claims in their Mem.Exs. E1, L2, M, N, O, D, P and C. No conclusions are implied as to the accuracy of either set of figures, but the listed figures represent a *floor* for plaintiffs' losses.

10. "Utilization cap" refers to the total number of patient days IDPA has assigned to each hospital. Hospitals that provide days of services in excess of their caps may not be paid for those services. For fiscal year 1984 IDPA states the total number of public aid patient days will be 1.9 million, a 4% increase from fiscal year 1983. IDPA Mem.Ex. J at 2, Ex. F at Assurances 3.

(a) St. Mary's Hospital may close due to the inadequacy of IDPA's Medicaid reimbursement rates. It estimates it will lose $1,928,291 due to IDPA's payment of a Shortfall Rate rather than its Final Rate. Pl.Mem.Ex.D.

(b) Englewood lost approximately $346,850 between July 1, 1983 and September 30, 1983 due to IDPA's payment of a Shortfall Rate rather than a Final Rate. As a result Englewood was not able to satisfy its financial obligations. Pl.Mem.Ex.A.

(c) LaRabida Children's Hospital and Research Center may close due to IDPA's Medicaid reimbursement rates. Pl.Mem.Ex.B.

(d) St. Bernard Hospital anticipates it will suffer a $2,176,277 "shortfall" loss in Medicaid reimbursement (but see Finding 14 and n. 9). In response to IDPA's payment rates the institution will close 22% of its beds and reduce its work force by 118,560 employee hours. Pl.Mem. Ex.O.

(e) Michael Reese Hospital and Medical Center may be required to curtail hospital services in an attempt to offset the impact of IDPA's Medicaid reimbursement rates. It projects a $5,570,-429 loss in inpatient reimbursement due to IDPA's payment of a Shortfall Rate rather than the Final Rate. IDPA's reimbursement rate also jeopardizes the institution's ability to borrow funds for necessary capital expenditures. Pl.R.Mem.Ex.C.

(f) Mary Thompson Hospital may consider closing its entire facility in response to IDPA's Medicaid reimbursement rates. It projects a loss of $1,988,-411 due to IDPA's Shortfall Rate (but see Finding 14 and n. 9). It plans to lay off 11% of its work force due to the inadequacy of IDPA reimbursement rates. Pl.R.Mem.Ex.D.

(g) Mount Sinai Hospital Medical Center has issued layoff notices to 160 employees in response to the financial crisis facing the institution precipitated by IDPA's Medicaid reimbursement rates. Its expected loss due to the payment of a Shortfall Rate rather than IDPA's Final Rate is $4,749,017 (but see Finding 14 and n. 9). Pl.R.Mem.Ex.A.

(h) CCOM will suffer a $3,344,288 "shortfall" loss that threatens the viability of that institution. Pl.Mem.Ex.E.

16. Pursuant to its revised fiscal year 1984 inpatient reimbursement methodology, IDPA determined an all-inclusive hospital per diem inpatient rate (i.e., a Final Rate) for each hospital participating in the Medicaid program. As described by IDPA (Mem.Ex.F at Assurance 2):

> The methodology is prospective in nature and does not rely on a procedure to reconcile audited costs and make a final reimbursement to hospitals.

17. After the commencement of this litigation IDPA's Acting Director wrote to HHS, stating a "request for funds" to pay the IDPA-determined Final Rates for fiscal year 1984 inpatient services would be presented to the Illinois General Assembly (IDPA Mem.Ex.B):

> Given the state of constitutional restrictions on appropriations, the Executive Branch cannot contract beyond the end of a fiscal year as the legislature only gives appropriations until the end of each individual fiscal year. The Illinois Department of Public Aid thus cannot, in this situation, obligate money that has not yet been and cannot yet be appropriated.
>
> However, I have consulted with the Governor on this issue and he has assured me that he is in total accord with a request of funds from the Illinois General Assembly which will allow the full payment of the deferred portion of the fiscal year 1984 obligations (that is, the deferred portion for services provided and paid during fiscal year 1984) during the 1985 fiscal year.

Thus IDPA contends it will remedy the shortfall problem by a "request for funds" to pay the IDPA Final Rates for 1984. But its executive branch "assurance" letter summarizes the true state of affairs: Illinois' General Assembly (the legislative

branch) controls appropriations, and the executive branch can do no more than "request" funds.

18. IDPA's contention is that it hopes to obtain in 1985 what it has not yet obtained for fiscal year 1984. In the budget process for 1984, the executive branch's Medicaid payment plan was not fully accepted by the legislature. In July 1984 IDPA informed hospitals that the fiscal year 1984 Final Rates were subject to legislative constraints for an unspecified number of future years. Pl.Mem.Ex. I, and 89 Ill.Admin.Code ch. I, § 140.371. IDPA now seeks to "assure" that the Final Rates for fiscal year 1984 will be paid by July 1985. That "assurance" lacks any factual basis in legislative developments, remains unspecified in time and is in reality only an assurance that a *request* will be made.

19. In any event, hospitals cannot borrow against a future assurance of a "request for funds"—as distinct from an assurance of the funds themselves. Hospitals cannot set budgets, establish salary levels, determine service levels and pay operating costs based upon a future fund request with no assurance of payment.

20. IDPA urges its new methodology does not violate the Act because there is no statutory requirement that reimbursement be made during the fiscal year (as distinct from part being paid during the fiscal year and part later). That argument is oversimplistic because it ignores the critical difference between (a) a state plan that *assures* hospital providers of payment of the rates mandated by the Act, simply deferring a portion of that payment, and (b) a plan that (like IDPA's) gives no assurance of the mandated amount being paid—or when it will be. In situation (a) the provider, if need be, can make current financing arrangements against the assured future payment, meanwhile having the capacity through such financing to maintain its staffing and facilities; in situation (b) the lack of assurance prevents the provider from taking the necessary actions described in Finding 19. Moreover even a plan that provided a guaranteed future "make-up appropriation" for fiscal year 1984 (as IDPA's does not) would fail to meet the federal standards mandated by the Act, unless the "final rates" established by that plan were higher than cash "final rates"— sufficiently higher to make up for the discounted value of the future payment. As a result any "final rate" that contemplates staged payments must take into account the cost of financing the future payments to the extent they are less than the hospitals' regular current cash requirements.

21. Although the Act itself contains no requirement that hospitals participate in the Medicaid program, hospitals that have accepted federal construction funds under the federal Hill-Burton programs *are* required to participate perpetually in the Medicaid program. 42 C.F.R. § 124.-603(c)(1)(ii) (1980). As our Court of Appeals said earlier this month in *American Hospital Ass'n v. Schweiker*, 721 F.2d 170 at 176 (7th Cir.1983):

> We note, first of all, that the regulation which mandates participation in the Medicare and Medicaid programs by all Hill-Burton hospitals, 42 C.F.R. § 124.-603(c), not only is virtually identical to that contained in the earlier regulations, see 42 C.F.R. § 53.113(d)(2), but also represents a codification of case law under the community service obligation. *Cook v. Ochsner Foundation Hospital*, 61 F.R.D. 354, 359–60 (E.D.La.1972).

Over two-thirds of the hospitals in Illinois are Hill-Burton hospitals. Pl.R.Mem.Ex.I. None of those 172 hospitals has the option of terminating its participation in the Medicaid program.

22. Under Generally Accepted Accounting Principles (GAAP) it is inappropriate for Illinois hospitals to plan for eventual receipt of their so-called Final Rates by booking a receivable for the difference between the fiscal year 1984 Shortfall Rates and Final Rates. Pl.Mem.Ex.J at ¶ 6. Moreover, under GAAP IDPA's assurance of a "request for funds" does not change that result. Pl.R.Mem. at 9, Ex. F.

*Conclusions of Law ("Conclusions")*

1. In determining whether issuance of a preliminary injunction is appropriate this Court must evaluate four criteria:

1. whether plaintiffs have demonstrated at least a reasonable likelihood they will succeed on the merits of the action;

2. whether plaintiffs will suffer irreparable harm for which there is no adequate remedy of law;

3. whether the threatened injury to plaintiffs outweighs the threatened harm the injunction may pose to defendants; and

4. whether issuance of the injunction will not disserve the public interest.

*Syntex Ophthalmics, Inc. v. Tsuetaki,* 701 F.2d 677, 681 (7th Cir.1983).

2. Under those standards courts have enjoined state amendments to Medicaid plans where plaintiffs have shown a reasonable likelihood of succeeding in establishing such plans fall short of meeting the requirements of the Act. *Children's Memorial Hospital v. IDPA,* 562 F.Supp. 165 (N.D.Ill.1983) (enjoining an application of the Medicaid utilization cap assigned by the state to the plaintiff hospital); *Wisconsin Hospital Ass'n v. Reivitz,* Medicare & Medicaid Guide (CCH) ¶ 32,380 (E.D.Wis.1983), *appeal docketed,* No. 83–1725 (7th Cir. 1983) (enjoining implementation of a Medicaid reimbursement freeze); *California Hospital Ass'n v. Schweiker,* 559 F.Supp. 110 (C.D.Cal.1982), *aff'd mem.,* 705 F.2d 466 (9th Cir.1983) (enjoining 6% cap on inpatient Medicaid reimbursement increases); *Nebraska Health Care Ass'n, Inc. v. Dunning,* 578 F.Supp. 543 (D.C.Neb.1983) (enjoining 4% reduction in Medicaid reimbursement for nursing home services).

3. Because the decision to issue a preliminary injunction is one of judicial discretion, "the requirement of a 'reasonable likelihood of success' [on the merits] is necessarily a somewhat flexible standard that allows the chancellor room for the exercise of judgment." *Fox Valley Harvestore, Inc. v. A.O. Smith Harvestore Prod-*

*ucts, Inc.,* 545 F.2d 1096, 1098 (7th Cir. 1976), *quoting Mullis v. Arco Petroleum Corp.,* 502 F.2d 290, 293 (7th Cir.1974). Moreover, in evaluating that criterion "[c]ourts need not defer to an administrative construction of a statute when there are 'compelling indications that it is wrong.'" *Espinoza v. Farah Manufacturing Co.,* 414 U.S. 86, 94–95, 94 S.Ct. 334, 339, 38 L.Ed.2d 287 (1973), quoting *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). In a Medicaid case concerning IDPA's 1983 reimbursement methodology, this Court acknowledged the flexibility of the deference standard by stating "substantial deference does not call for abdication of this Court's responsibility." *Children's Memorial Hospital,* 562 F.Supp. at 170.

**A. *Reasonable Likelihood Of Success on the Merits***

4. Plaintiffs have demonstrated far more than a reasonable likelihood of success on the merits (which is the only merits-related standard they are required to meet). IDPA's Shortfall Rates, which are approximately 23.5% less than what IDPA determined would be appropriate reimbursement for hospitals under its own fiscal year 1984 reimbursement methodology, clearly do not (based on IDPA's own determination) meet the Act's requirement that hospitals be reimbursed at rates "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable state and federal laws, regulations, and quality and safety standards...."

5. IDPA's Shortfall Rates are being paid to Illinois hospitals solely in response to the budgetary shortfall in the General Assembly's fiscal year 1984 inpatient services appropriation. Because those Shortfall Rates are so far below IDPA's Final Rates, which were based on IDPA's calculations as to the amounts necessary to satisfy the Act's requirement quoted in

Conclusion 4, the Shortfall Rates are by definition unreasonable and inadequate in relation to the Act's standards.

■ 6. Medicaid payment rates may not be based solely on budgetary needs. *Alabama Nursing Home Ass'n v. Harris*, 617 F.2d 388, 396 (5th Cir.1980) made that plain:

> Inadequate state appropriations do not excuse noncompliance. A state may not circumvent its previous guarantee of reasonable cost related reimbursement by failing to take requisite steps to ensure adequate funding of the program's projected expenditures.

*Thomas v. Johnston*, 557 F.Supp. 879, 914 (W.D.Tex.1983) (emphasis added in part) similarly stated:

> The federal statutory standard and its attendant legislative history clearly require that the *conclusive* factor in rate determination *must not be* the amount of money appropriated by a given state's legislature; rather the state Medicaid agency must make an objective, principled decision with regard to what rates are reasonable and adequate.

*See also Alabama Nursing Home Ass'n v. Califano*, 433 F.Supp. 1325, 1330 (M.D.Ala. 1977):

> If a state could evade the requirements of the [Medicaid] Act simply by failing to appropriate sufficient funds to meet them, it could rewrite the congressionally imposed standards at will.[11]

As *Welfare Rights Organization of Allegheny County v. Shapp*, Medicare & Medicaid Guide (CCH) ¶ 28,597, at 10,075 (W.D.

Pa.1977) put it, in the face of inadequate Medicaid appropriations a state has only two options: "cancel the plan ... or provide the money to carry out the plan."

7. In *Wisconsin Hospital Ass'n* and in *California Hospital Ass'n* (both cited in Conclusion 2) federal courts have enjoined states' impositions of limitations on Medicaid reimbursement rates based on budgetary considerations rather than compliance with the Act's standards. In each of those cases the degree and level of noncompliance were far less egregious than IDPA's 23.5% shortfall described in the Findings.

8. In opposition to the squarely applicable and compelling federal authorities cited in Conclusions 6 and 7, IDPA wrongly contends it has discretion to fashion Medicaid payments based on available legislative appropriations, citing in support of that false proposition a case involving payment levels for the state's General Assistance program. *Estep v. Illinois Department of Public Aid*, 115 Ill.App.3d 644, 71 Ill.Dec. 402, 450 N.E.2d 1281 (1st Dist.1983). That case has no relevance because it involves a *state-controlled* public aid program in no way tied to the requirement and the standards set forth in the Act.

9. By tieing payment rates solely to state budgetary needs, IDPA has totally ignored the federal mandate that rates must be adequate to assure Medicaid beneficiaries reasonable access to hospital services of adequate quality, Section 1396a(a)(30). Several Illinois hospitals have stated the inadequate fiscal year 1984 inpatient reimbursement threatens their continued viability. *See* Pl.Mem.Exs. A, B

---

**11.** Omnibus Reconciliation Act ("OBRA") of 1980 modified the former Medicaid requirement, under which states paid for nursing home and intermediate care facility services on a reasonable cost-related basis, to the current standard that requires the state pay at rates that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated facilities. OBRA 1980 § 962(a), Pub.L. 96–499 (1980). That is the identical standard Congress instituted in 1981 for hospitals— the standard at issue in this case. OBRA 1981 § 2173, Pub.L. 97–35 (1981). In the House-Senate Conference Report to OBRA 1980 (reprinted in Medicare & Medicaid Guide (CCH) ¶ 24,407),

the conferees specifically stated "their intent that a State not develop rates under this section solely on the basis of budgetary appropriations." And the Senate Report accompanying the change in the payment standard for hospitals in OBRA 1981 stated the change with respect to hospitals was consistent with actions previously taken by Congress with respect to nursing homes. S.Rep. No. 139, 97th Cong., 1st Sess. 478, *reprinted in* 1981 Code Cong. & Ad.News 396, 744. Thus the warning to states against developing rates solely upon the basis of budgetary appropriations is equally applicable in the context of hospitals. Yet that is what IDPA has really done here.

and D. Significantly those hospitals serve high proportions of Medicaid patients. *Id.* IDPA has not considered the impact on Medicaid patients' access to care if those and other hospitals are forced to curtail or cease operations entirely as a result of the inadequate fiscal year 1984 payments.

10. This Court has considered fully and has rejected the concept that the doctrine of "primary jurisdiction" applies to preclude issuance of this preliminary injunction. Primary jurisdiction is a common-law doctrine that enables a court to determine the appropriate timing of its own exercise of jurisdiction so that an agency sharing concurrent jurisdiction with the court over the subject matter has time to make its own findings with respect to the claims and disputes. *United States v. Western Pacific R.R.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). Its objective is to encourage "proper relationships between courts and administrative agencies charged with particular regulatory duties." *Id.* at 63, 77 S.Ct. at 164. Primary jurisdiction is appropriately invoked "when a claim is cognizable in a court but adjudication of the claim" requires the special competence of administrative bodies created by Congress to regulate the subject matter. *Hansen v. Norfolk & Western Ry.*, 689 F.2d 707, 710 (7th Cir.1982).

11. Plaintiffs contend that in total contrast to proper occasions for the application of primary jurisdiction concepts, under the Act HHS does not perform an adjudicatory function with respect to any Medicaid reimbursement scheme IDPA may adopt. They argue neither the Act nor its implementing regulations provide for adjudicative proceedings whereby hospitals and program beneficiaries can present to HHS evidence detailing their complaints with IDPA's reimbursement methodology for hospital inpatient services to HHS. On the contrary, plaintiffs say, HHS requires only that IDPA submit assurances to HHS that *IDPA* has made findings its Medicaid hospital inpatient reimbursement rates satisfy federal standards.[12] Plaintiffs therefore conclude that as HHS has performed no independent investigation or adjudication of the adequacy of IDPA's Medicaid reimbursement rates, deferral to its "approval" process is not required by the doctrine of primary jurisdiction.

12. It is unnecessary for purposes of this order to determine the validity of plaintiffs' arguments expressed in Conclusion 11. Even were the primary jurisdiction doctrine applicable to HHS' ultimate review of IDPA's establishment of Medicaid reimbursement rates, that could go *only* to IDPA's determination of what this order terms Final Rates: the amounts necessary to satisfy the Act's "reasonable and adequate" requirement. This order has assumed arguendo the *correctness* of IDPA's determination in the latter respect. All that is before this Court now is a purely legal question: whether IDPA, having decided what amounts are "reasonable and adequate," can pay *less* than those amounts because the Illinois General Assembly's appropriation does not permit full funding. And on that purely legal score the administrator has no expertise, no special competence. Conclusions 4–9 establish plaintiffs' likelihood of success on the ultimate merits, and the Findings and the following Conclusions establish the irreparability of harm plaintiffs will sustain if compelled to function (or more accurately, to cease functioning) under the deprivation of "reasonable and adequate" reimbursement caused by the Shortfall Rates.

B. *Plaintiffs' Harm is Substantial, Immediate and Irreparable, and They Have No Adequate Remedy at Law*

13. As already stated, IDPA itself has determined the Final Rates to be the "rea-

---

**12.** As *Children's Hospital of Philadelphia v. Secretary of Department of Public Welfare,* 568 F.Supp. 1001, 1007 (E.D.Pa.1983) (emphasis in original) recently held, the Medicaid amendments of 1981 "do not contain any language that suggests that the *methods and standards* of payment be approved by the Secretary. The state agency need only make assurances that the resulting *rates* are reasonable and adequate under federal law."

sonable and adequate" level required to reimburse the hospitals for inpatient hospital services rendered to Medicaid beneficiaries. IDPA's partial reimbursement of plaintiff hospitals at the Shortfall Rates, which are 23.5% less than the Final Rates, will adversely affect every Illinois hospital providing inpatient services to Medicaid beneficiaries.

14. Plaintiffs have demonstrated that at the Shortfall Rates many Illinois hospitals will be unable to maintain the availability, quality and scope of services necessary to serve their patients and communities. Plaintiffs are presently suffering substantial and irreparable harm because IDPA's payment of Shortfall Rates fails to satisfy the federal statutory requirements that Medicaid reimbursement rates be sufficient to insure quality of care and be "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable state and federal laws, regulations, and quality and safety standards...." 42 U.S.C. §§ 1396a(a)(30), 1396a(a)(13)(A).

15. IDPA seeks to inject a false issue into this proceeding by its claim that the total of (a) the fiscal year 1983 reconciliation payments and (b) the fiscal year 1984 Shortfall Rate payments puts plaintiff hospitals in a better financial position today than they were one year ago. Payments currently made in satisfaction of IDPA's statutory obligation to make reconciliation payments for fiscal year *1983* are wholly irrelevant to the determination and satisfaction of IDPA's duty under the Act for fiscal year *1984*. IDPA's "interim" payments for fiscal year 1983 plus the reconciliation payments for the same fiscal year, though made after the end of that fiscal year, together satisfy IDPA's reimbursement obligation for fiscal year *1983*. IDPA improperly attempts to have the same dollars do double duty—counted once for fiscal year 1983 to satisfy its duty for that year, and counted again for fiscal year 1984 to show the absence of hardship to the hospitals in cash flow terms. That will

not wash, for the hospitals do not have the luxury of IDPA's sleight of hand "accounting": They can only use the same dollars once.

16. Even on IDPA's own terms, however, its premise is false. Under the IDPA methodology in effect for fiscal year 1983, plaintiff hospitals knew the "interim" payments they were receiving would be reconciled after the end of that year, so the aggregate amounts would represent reimbursement of reasonable costs for *that* year only. That knowledge plus their right to receive reconciliation payments enabled them to take steps—including borrowing—to manage their cash flow until the reconciliation was made. Accordingly their current receipt of the fiscal year 1983 reconciliation payments provides only funds allocable to and budgeted for *that* year. By contrast, plaintiff hospitals can budget for fiscal year 1984 only in terms of funds paid and *assured* to be paid for this year. Under IDPA's revised methodology there is no longer a reconciliation process that provides additional funds. This year's Shortfall Rates are the *only* assured appropriation, and no hospital can undertake short-term borrowing against such a shortfall, in the same way that was possible for them during fiscal year 1983, when they knew additional monies would be paid within a fixed time frame.

17. For purposes of the present order plaintiffs have sufficiently demonstrated their losses, which they have incurred and will continue to incur if they are reimbursed only at IDPA's Shortfall Rates rather than the Final Rates, are much more than mere money alone. Those losses threaten the viability of Illinois hospitals. Continued reimbursement at the Shortfall Rates will force the reduction or even elimination of critically important hospital services (and is likely to force the closing of some plaintiffs). Such reductions, eliminations and closing will inevitably threaten the health of Illinois Medicaid beneficiaries and the employment status of Illinois hospital employees, many of whom are losing and will lose their jobs and thus may be

permanently lost to the Illinois health care industry.

18. Preliminary injunctive relief is necessary to avoid the daily losses caused by inadequate Medicaid reimbursement. Plaintiffs have made far more than a prima facie showing such losses are threatening the viability of Illinois hospitals, the quality and scope of services they render and the health and well-being of the Medicaid beneficiaries they serve.

C. *Any Balancing of Relative Harms (or Hardships) Favors Plaintiffs*

19. IDPA has acknowledged the interim relief requested by plaintiffs, requiring IDPA to reimburse hospitals for inpatient services at their IDPA Final Rates, will impose no real burden on IDPA. IDPA has already calculated each hospital's Final Rate and thus has only to substitute those Final Rates for the Shortfall Rates presently in IDPA's computer system.

20. Issuance of a preliminary injunction cannot be viewed as imposing a severe hardship on the citizens of Illinois.[13] Once a state has voluntarily elected to participate in the Medicaid program, as Illinois has, it must comply with all federal Medicaid standards. *Alabama Nursing Home Ass'n,* 617 F.2d at 396. Accordingly no state may characterize its duty to comply with the requirements of an elective program such as Medicaid as constituting a hardship to its citizens.

21. Even were the impact of a preliminary injunction on IDPA substantial (as it is not), the harm plaintiffs would sustain if the injunction were denied (see Conclusions 13–14 and 17–18) is so great and irreparable that the balance of hardships must be found to favor plaintiffs as long as the damage to IDPA caused by granting the injunction can be adequately remedied. *Ohio Oil Co. v. Conway,* 279 U.S. 813, 815, 49 S.Ct. 256, 257, 73 L.Ed. 972 (1929) (per curiam). That accurately describes the situation here: If the preliminary injunction is granted but IDPA were nevertheless ultimately to prevail on the merits, it is highly likely that the additional expenditure of funds during the pendency of the injunction could readily be restored to IDPA through adjustments to plaintiffs' individual payment rates or some other cost settlement mechanisms. *Michigan Osteopathic Medical Center, Inc. v. Dempsey,* Medicare & Medicaid Guide (CCH) ¶ 31,934 (E.D.Mich.1982).

D. *Issuance of a Preliminary Injunction Will Affirmatively Serve the Public Interest*

22. All the law requires of a plaintiff is a showing the preliminary injunction "will not disserve the public interest." That showing is unquestionably satisfied here, for it cannot be said an injunction that compels compliance with the Act—a congressional mandate, the classic expression of the "public interest" in a democracy—could *disserve* the public interest. But plaintiffs have exceeded the necessary showing, for they have demonstrated the preliminary injunction will clearly affirmatively *serve* the public interest by preserving plaintiffs' ability to provide care and medical services to Illinois' Medicaid beneficiaries.

23. IDPA may legitimately take state budgetary factors into consideration when developing its reimbursement methodology. What it may not do, however, is to flout the Act's requirements for reimbursement of hospitals under the Medicaid program in order to suit state budgetary needs. *Alabama Nursing Home Ass'n,* 617 F.2d at 396; *see also Thomas,* 557 F.Supp. at 914. That is what IDPA has done here. Surely the public interest would be disserved by permitting IDPA thus to violate its duty to administer a viable state Medicaid program consistently with federal law and regulations.

---

**13.** By definition a large segment of Illinois residents—the Medicaid beneficiaries—will be benefited by this order. That fact, though of course important, is not wholly controlling for current purposes.

24. IDPA Mem. 50–51 asserts plaintiff hospitals may "terminate their relationship with Medicaid and no longer accept Medicaid recipients as [patients]" if they are dissatisfied with Medicaid reimbursement rates. Even to the limited extent that represents a possible alternative, it would be wholly counterproductive in terms of the public interest: Any payment structure that would irreparably destroy the ability of many hospitals to serve the medically indigent of their communities disserves the public interest in the broadest sense of that term.

\*     \*     \*

For all the foregoing reasons this Court concludes:

1. Plaintiffs have proved they have at least a reasonable likelihood of success on the merits of their claim that IDPA's fiscal year 1984 inpatient payment rates (the Shortfall Rates, not the Final Rates) are arbitrary and unreasonable and in violation of Sections 1396a(a)(13)(A) and 1396a(a)(30).

2. Plaintiffs have no adequate remedy at law and will otherwise be irreparably harmed by continued reimbursement at those arbitrarily and unreasonably low and illegal rates.

3. Injuries the plaintiffs will continue to sustain by reason of those arbitrary, unreasonable and illegal rates of reimbursement, if no preliminary injunction were to be granted, far outweigh any asserted threatened harm a preliminary injunction may cause IDPA.

4. Granting the preliminary injunction will promote—not disserve—the public interest as defined by Congress.

It is therefore ordered that until otherwise ordered by this Court:

1. IDPA shall pay to each Illinois hospital participating in the Medicaid program its "Final Rate" for all unpaid claims for inpatient services to Medicaid recipients during fiscal year 1984. All such claims shall be paid expeditiously after the respective participating hospitals shall have complied with the reasonable administrative requirements established by IDPA for pay-

ment of such claims. For purposes of this order the "Final Rate" for each hospital means the rate specified in IDPA notifications to that hospital (generally dated on or about June 14, 1983) and includes any modifications or adjustments that may have been granted to that hospital as a result of a successful appeal of its fiscal year 1984 Final Rate (pursuant to 89 Ill.Admin.Code ch. I, § 140.372).

2. Any changes or alterations proposed by IDPA that would adversely affect the amounts or rates or timing of payments required to conform to the preceding paragraph shall not be implemented without prior submission to this Court for review and approval.

3. At the status hearing held December 2, 1983 the parties submitted argument and authorities on the question of security (if any) to be given by plaintiffs as provided in Rule 65(c). They agree there is always a period of delay in IDPA's payment of reimbursement claims to hospitals in the ordinary course. Moreover IDPA can recover any excess reimbursements made to most plaintiff hospitals (including all Association members in the term "plaintiff hospitals") out of *future* reimbursable amounts, given the fact Hill-Burton-financed hospitals cannot withdraw from the Medicaid program. This Court specifically finds (a) IDPA has ample security, in the form of its ability to recapture any excess reimbursements out of future Medicaid reimbursements, for the payment of any costs or damages it may incur or suffer were it found to have been wrongfully enjoined or restrained (Rule 65(c)) and (b) no surety bond or undertaking is required under Rule 65.1. Each hospital receiving payment of Final Rates by virtue of this order shall, as a condition of such receipt, be deemed to have consented to IDPA's right of recapture as described in this paragraph.