**KANSAS HEALTH CARE ASSOCIATION, INC., and Kansas Association of Homes for the Aging, Inc., Plaintiffs,**

v.

**KANSAS DEPARTMENT OF SOCIAL AND REHABILITATION SERVICES, and Dennis R. Taylor, as Acting Secretary of the Department of Social and Rehabilitation Services, Defendants.**

Civ. A. No. 90–4207–S.

United States District Court,
D. Kansas.

Dec. 31, 1990.

**1504**

Richard D. Anderson, Jeffrey A. Chanay, Entz, Anderson & Chanay, William E. Enright, Scott, Quinlan & Hecht, Topeka, Kan., for plaintiffs.

Bruce A. Roby, Waggener & Arterburn, Topeka, Kan., Patrick D. Gaston, Bennett, Lytle, Wetzler, Winn & Martin, Prairie Village, Kan., for defendants.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on motion of the plaintiffs for a preliminary injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure. Also before the court is defendants' motion to dismiss for plaintiffs' alleged lack of standing. Plaintiffs Kansas Health Care Association, Inc. and Kansas Association of Homes for the Aging, Inc. (hereafter referred to jointly as "KHCA" or "plaintiffs") bring this action asserting the rights of members of their respective professional associations, *i.e.*, nursing homes operating in the state of Kansas. This case involves a challenge to state Medicaid reimbursement plans and recently implemented state regulations which affect the current reimbursement schedule for nursing home providers who care for Medicaid recipients. Plaintiffs allege that the defendants have violated the Boren Amendment to the Medicaid Act, 42 U.S.C. 1396a(a)(13)(A), by failing to establish reasonable and adequate rates of reimbursement for Medicaid providers. Plaintiffs' motion for a preliminary injunction was tried to the court on December 18, 19 and 20, 1990.

## FINDINGS OF FACT

Based upon the evidence before the court at this time, the court makes the following findings of fact.

1. Kansas Health Care Association, Inc. and Kansas Association of Homes for the Aging, Inc. are nonprofit trade associations representing both nonprofit and for-profit Kansas nursing facilities. The combined membership of the two associations includes 335 nursing facilities or 88% of all licensed nursing facilities in Kansas.

2. Members of the plaintiff associations are participants in the Kansas Medicaid program who receive reimbursement from the state and federal government for health care services provided to eligible Medicaid recipients.

3. Kansas has elected by statute, namely K.S.A. 39–708c, to participate in the Medicaid program contained in Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.*

4. The Department of Social and Rehabilitation Services is responsible for the administration of the Kansas Medicaid Plan. *See* K.S.A. 39–708c.

5. On August 30, 1990, the Department of Social and Rehabilitation Services published notices in the *Kansas Register* of proposed amendments to the Kansas state plan for reimbursement rates for Medicaid providers. 29 Kan.Reg. at 1296–97.

6. On October 1, 1990, the Department of Social and Rehabilitation Services (hereafter "SRS") implemented a Medicaid reimbursement rate freeze. This rate freeze, titled State Plan Amendment TN–90–44, is to be maintained until September 30, 1991. In addition to the rate freeze, SRS also implemented a plan, TN–90–06 under which health care providers would be reimbursed on a pass through basis as they come into compliance with federal mandates.

7. Under these amendments, Medicaid providers are reimbursed for costs incurred while providing for Medicaid recipients based upon information taken from the most recent cost reports on file with SRS as of August 31, 1990. A cost report is a report submitted by a provider at the end of its fiscal year. In a cost report, all costs of a provider are recorded on an SRS form referred to as a MS–2004. This report is then subject to a desk review and a full field audit by SRS. Upon completion of the review and audit, a prospective rate of reimbursement for care provided to Medicaid recipients is calculated. In order to provide a prospective rate of reimbursement, figures from cost reports are inflated using historical inflation. In addition, the rate of reimbursement is further adjusted to provide for future inflation (hereafter referred

to as "estimated inflation"). Finally, the prospective rate of reimbursement is subject to certain rate-setting limitations known as "cost center limits." Under the former state plan, rates were adjusted at least two times during a facility's fiscal year, once in October (SRS Schedule A–1) and once at the facility's fiscal year-end (SRS Schedule A).

8. While calculating prospective rates of reimbursement for the amended state plan, SRS considered a recommendation made by its contractor, the accounting firm of Myers and Stauffer, CPA (hereafter "Myers and Stauffer"). Myers and Stauffer derived a recommended rate of estimated inflation after conducting a review of recent articles which discuss inflation and economic trends. Among factors which are considered are the gross national product and the consumer price index. Bruce Myers of Myers and Stauffer, CPA recommended a rate within the range of 4.8% to 6.0%. (Defendants' Exh. 405, at 285). SRS subsequently adopted a 4.8% estimated rate of inflation.

9. The rate of reimbursement for nursing facilities depends upon when that nursing facility last filed a cost report. Thus, the present rate of reimbursement for some facilities is calculated using cost reports filed as of August 31, 1989, which reflect the provider's actual audited approved costs incurred between September 1, 1988, and August 31, 1989.

10. To update the older cost reports on file, SRS adjusted the older cost reports by applying historical inflation factors, namely the consumer price index, in an attempt to make the older cost reports more current.

11. The "cost report effect" is the difference between the rates of reimbursement and the actual costs incurred by health care providers at the time of reimbursement.

12. For Kansas fiscal year 1991, SRS received approximately $30,000,000.00 less in allocated funding for reimbursement for nursing facilities than it had originally estimated that it needed to be in compliance with applicable state and federal laws concerning reimbursement for providers of Medicaid care.

13. Defendant Dennis Taylor, Acting Secretary of the Department of Social and Rehabilitation Services (hereafter "Secretary Taylor"), testified that the information contained in "Narrative Information—DA 400" prepared for the Division of the Budget, Department of Administration for the State of Kansas (Plaintiffs' Exh. 2) is an estimate of the amount of funds which would be needed by SRS in order to comply with federal mandates required by the federal Nursing Home Reform Act and the Omnibus Budget Reform Act of 1987. In this narrative, Narrative Information—DA 400, SRS originally estimated that it needed $21,553,000.00 to comply with the federal mandates.

14. Under the Nursing Home Reform Act and the Omnibus Reform Act of 1987 (hereafter "OBRA '87"), Medicaid providers must satisfy the following federal mandates in order to qualify for Medicaid reimbursement:

a. combine intermediate care facilities and skilled nursing facilities by bringing the level of care of intermediate care facilities up to that of skilled nursing facilities;

b. provide 24 hour nursing coverage;

c. employ physicians as designated medical directors for each facility;

d. employ a social worker for each nursing facility with more than 120 beds; and

e. provide standardized assessments of residents.

Accordingly, reimbursement rates are to include the estimated costs of compliance with these requirements mandated by OBRA '87.

15. Despite SRS's earlier determination that it needed in excess of $20 million to satisfy federal mandates, on August 30, 1990, Secretary Taylor submitted a letter to the Associate Regional Administrator for Medicaid, Richard P. Brummel, that "this state plan [TN–90–06] is a comprehensive package to meet all OBRA requirements." (Defendants' Exh. 404, at 132). These assurances were made despite the fact that

the total amount of additional funds allocated for satisfying the OBRA '87 requirements were $18,814,000 less than those contained in the Narrative Information–DA 400 summary. Accordingly, SRS's estimated costs of compliance with federal mandates had been reduced from $21,553,000 to $2,739,000.

16. Secretary Taylor testified that it was not uncommon for a budget request to be off by more than $18,000,000.

17. Plaintiffs' Exh. 29 was prepared at Secretary Taylor's request. This document, titled "Summary and Economic Impact Statement Concerning Certain Permanent Administrative Regulations Adopted by the Acting Secretary of Social and Rehabilitation Services At an Open Meeting on September 18, 1990," indicates at page 9 that the impact of the Kansas regulations which implement the disputed rate freeze, namely K.A.R. 30–10–19, will "save the agency up to $10 million in staying within limited budget appropriations while attempting to meet payment requirements."

18. This document further reflects that the bearer of the loss will be the nursing facility providers who "will absorb these limitations through economic and efficient operations." (Plaintiffs' Exh. 29).

19. This document further states that resident care may be most affected by operation changes necessitated by the reimbursement freeze. "Resident care may ultimately be affected based on management decisions made by the individual providers." (Plaintiffs' Exh. 29).

20. Secretary Taylor testified that SRS felt that a rate freeze would be better than another option considered by SRS, i.e., a flat rate increase.

21. Since the commencement of this litigation, SRS has requested additional funds from the Kansas legislature on grounds that the rate freeze and reimbursement schedule for meeting OBRA '87 requirements may be enjoined by this court, or in the alternative, the plans are not approved by the Secretary of the Health Care Financing Administration (hereafter "HFCA"). (Plaintiffs' Exh. 31, at 7–8).

22. In its budget appeal, SRS is asking for allocations which would allow an 8% increase in previous rates of reimbursement which, according to Secretary Taylor, is consistent with the medical price index. (Plaintiffs' Exh. 4, at 524).

23. As implemented, the current rate freeze will extend into the state's fiscal year 1992. The state's fiscal year 1991 ends in June. Thus, the rate freeze will run until September 30, 1991, three months into fiscal year 1992.

24. According to the budget narrative submitted by SRS for fiscal year 1992, the proposed SRS budget at the A and B level will result in 3600 fewer recipients qualifying for Medicaid funds. (Plaintiffs' Exh. 4, at 521 and 523). The SRS A and B budget levels reflect minimum budget requests. A C level budget request seeks a greater amount of funds which reflect a level which SRS would like to fund. This reduction, at the A and B level, in eligibility will be accomplished by "lowering eligibility to 150% of Supplemental Security Income (SSI)." (Plaintiffs' Exh. 4, at 523). This decrease will result in an A and B level budget request which is $19.3 million below the fiscal year 1991 request.

25. The impact of reducing the number of those eligible for Medicaid was summarized as follows by SRS. "It is estimated that 3,420 Medicaid residents in nursing facilities will no longer be eligible for payment. While some providers may write off a small uncollected portion of a billing, a resident who is no longer eligible for Medicaid may lose a monthly payment of $700 a month or more. Most providers will not write off $700 a month and will request the resident to move." (Plaintiffs' Exh. 31, at 15).

26. Secretary Taylor testified that the impact of the A and B level budget for 1992 will be offset by a supplemental budget request by SRS. He further testified that over the past 12–15 years SRS has asked for and received supplemental budget funding.

27. The duties of William R. McDaniel, Administrator for the Department of SRS (hereafter "Mr. McDaniel"), include looking

at the broad policy planning of Medicaid reimbursement. He compiled many of the numbers for the SRS budget requests.

28. On April 1, 1990, minimum wage under federal law increased to $3.85 per hour. On April 1, 1991, minimum wage requirements will increase to $4.25 per hour. In the early 1980's and late 1970's increases in federal minimum wage requirements were included as factors in the state's Medicaid reimbursement formula. It was a reimbursement factor added onto the per diem rate (rate per patient day). (Plaintiffs' Exhs. 2, 9, 10, and 20).

29. In SRS's "Summary of Budget Request," a budget worksheet prepared for the Governor, a specific adjustment for the federal minimum wage increase is included. This adjustment totals $7,882,029. (Plaintiffs' Exh. 7, at 3).

30. In the final appropriation from the state, no amount was requested or granted for minimum wage requirements. H.B. 3088 (Plaintiffs' Exh. 26). Mr. McDaniel testified that a "majority [of nursing facilities] were already at minimum wage and more." However, defendants presented no evidence of the number of facilities which presently paid their employees at levels equal to or greater than federal minimum wage requirements due to go into effect April 1, 1991. Mr. McDaniel testified that, although wage information is available from each facility, SRS has not requested such information. Further, he did not know if any facilities were currently paying employees below the amount mandated as of April 1, 1991.

31. In SRS's spreadsheet based upon final appropriations from the state, no funds are earmarked for the federally mandated minimum wage increase. (Defendants' Exh. 410). Mr. McDaniel testified that it was a decision of the House subcommittee not to fund the line item for the federally mandated minimum wage increase. Further, the legislature conducted no studies to determine how many facilities would be affected by the federal minimum wage increase in 1991.

32. Mr. McDaniel testified that the original budget narrative prepared by SRS employed a 6% inflation rate. He further testified that this was based upon general inflation indicators (i.e., consumer price index) rather than the medical price index. These figures were derived from articles compiled by SRS's contractor, Myers and Stauffer, CPA. Contained in these articles is information that indicates that the costs of medical care are rising between 5–7.5% annually. (Defendants' Exh. 405, at 312). Mr. McDaniels testified that the House subcommittee adjusted the inflation factor to 4.8%.

33. The actual formula employed for reimbursement under the rate freeze is:

$$R = (\text{Minimum of PC or AC}) + I + PF + NC + O$$

Where R = Rate per resident day

PC = Provider's resident related costs per resident day adjusted by historical and estimated inflation factors

AC = Allowable costs per resident day for current limitation period

I = Incentive factor—current limitation period.

PF = Real and Personal Property Fee

NC = Nursing Component for 24 Hour Coverage

O = OBRA (Nursing Home Reform Act) Factors

(Defendants' Exh. 407, at 2241).

34. The provider's resident related costs per resident day were adjusted for historical inflation factors according to the chart contained in Schedule B of the Kansas Medicaid State Plan. (Defendants' Exh. 407, at 2255).

35. Jack Gump was formerly the Director of Adult Care Home Services of the Department of Social and Rehabilitation Services. His duties at the time the rate freeze was under consideration were to enter into general provider agreements, conduct peer reviews, and to put together a budget for his particular department.

36. Mr. Gump testified that shortly before the budget was to be presented to the legislature, Secretary Winston Barton informed him that he would have to cut $30,000,000.00 from his budget estimates because the Governor was going to recom-

mend less money for SRS's budget. Mr. Gump believed that he needed "a good portion of the $30,000,000 to be in compliance [with OBRA '87 requirements]." In Mr. Gump's opinion the costs of OBRA '87 requirements were "hard to calculate." Mr. Gump further testified that a rate freeze was the best that could be done in an "underfunded situation."

37. Mr. Gump testified that in order to meet OBRA '87 requirements, the cost report effect had to be eliminated. Further, Mr. Gump testified that no studies were conducted on the impact of the rate freeze. According to Mr. Gump, under the rate freeze, the providers will get more on October 1, 1990, but less than they would have under the old system upon their filing of a new cost report.

38. Mr. Gump testified that SRS's position in regard to the federally mandated minimum wage increases is different than in the early 1980's and late 1970's. He specifically stated that in the early 1980's the agency wanted to reimburse facilities for the costs that a provider incurred in meeting minimum wage standards. However, the Kansas legislature specifically chose not to reimburse providers for these costs which will be incurred in meeting minimum wage requirements as of April 1, 1990 and April 1, 1991.

39. Mr. Gump testified that there currently is not enough money in the present SRS budget to cover the minimum wage increases mandated by federal law. He further testified that, as reflected in Defendants' Exh. 410, there is no money in the final SRS budget allocation for the cost report effect. The elimination of both the cost report effect and minimum wage increase allocation results in a loss in real dollars to health care providers.

40. Katherine Marie Wade of Myers and Stauffer, CPA testified as an official representative and expert witness for SRS. Ms. Wade had compiled the formal state findings which defendants allege support Secretary Taylor's assurances to the federal government. (Defendants' Exh. 405, at 220–334). However, the ultimate determination of whether the rates generated by the amended State Plan are "reasonable and adequate" was made by SRS.

41. The findings study prepared by Ms. Wade compared anticipated per diem costs to the prospective Medicaid reimbursement rate. (Defendants' Exh. 405, at 268). The study was conducted in anticipation of the rate freeze in July, 1990. The data used to generate the findings were those contained in the most recent cost reports on file on July, 1990, the date of the study. Thus, the cost reports utilized for purposes of the study were between 5–17 months old depending upon when each facility last filed its fiscal year end cost report. To account for the differences in filing dates, older cost reports were adjusted using the consumer price index to inflate the information to the present time.

42. SRS and its contractor, Myers and Stauffer, CPA, have never conducted a retrospective review to determine how cost rates in effect compare to the actual costs incurred at the time of reimbursement. This is true despite the availability of current cost data of Medicaid providers upon request by SRS.

43. Inflation in the health care industry has outpaced inflation in general as reflected in the consumer price index and the medical price index. (Defendants' Exh. 405, at 287, 291, 292, 297, 312, and 317). Despite the disparity between the two indices, SRS employs the lower Consumer Price Index in establishing its historical inflation adjustment.

44. In determining whether the rates were adequate to meet the anticipated costs of each facility, Myers and Stauffer combined numbers from facilities by utilizing a weighted average (i.e., the cost report of each facility weighted by the number of resident days). Based upon this weighted average, Myers and Stauffer determined that the limits on the rate of reimbursement were adequate to cover the estimated and inflated costs of the average combined nursing facility.

45. In a facility-specific rate system, the relationship of a weighted average does not reveal any meaningful relationship between how the prospective rates of reim-

bursement actually affect individual facilities. Thus, the validity of the findings which have been proffered to support the conclusion that the rates are reasonable and adequate is extremely questionable. Accordingly, any assurances that the rate of reimbursement is reasonable and adequate based upon these findings are questionable.

46. No studies were conducted to analyze what would be the impact on or cost to individual facilities coming into compliance with OBRA '87. Instead, to determine impact of the specific OBRA '87 requirement that intermediate care facilities be brought up to the level of skilled nursing facilities, Myers and Stauffer combined the accounting factors for the two types of facilities into one accounting array. The net effect was that the percentile cap or limitation for reimbursement for those facilities was increased. This demonstrates the overall impact upon the state budget; however, it does not reflect what would be the actual impact on individual facilities.

47. Ms. Wade testified that the definition of an efficiently and economically operated facility is implicit in the rate setting methodology. Other than this implicit definition of an efficiently and economically operated facility, the defendants presented no evidence of findings for the definition of an efficiently and economically operated facility.

48. According to Ms. Wade, facilities which are receiving their costs at the rate set by SRS are implicitly economic and efficient. She further testified that if the rate set meets the costs incurred then the rate is reasonable and adequate. The court finds this reasoning to be circular, and accordingly, it provides no support for the inference that the rates, as set, are reasonable and adequate to cover the costs of an economic and efficiently operated facility. This is especially true when no studies have been conducted to determine how many facilities are actually receiving their costs at the current rates of reimbursement. In order to satisfy the requisite finding that the rates are reasonable and adequate, the comparison of actual costs to current rates of reimbursement must be made in order to compare the rates, as set, with the costs which have been incurred.

49. The only study which was conducted to determine the impact of the federal minimum wage increase was to determine what were the average wages of various levels of employees. Because the average wages appeared to be close to the federal minimum wage level of $4.25, SRS determined that the impact of the increase would not be significant. Based upon these findings, SRS concluded that the facilities were reimbursed fully for those costs associated with wages. Once again, the court finds that these findings which are based upon an average figure do not reflect the actual costs individual providers will have to incur in order to come into compliance with federal law. Furthermore, the court finds that this impact could readily be determined by SRS upon their request to individual providers for current wage information.

50. John E. Lehman, the Administrative Director of the Apostolic Christian Home in Sabetha, Kansas, submitted the following testimony at the hearing. Mr. Lehman last submitted a cost report on September 25, 1990. Under the rate freeze, the rate of reimbursement received by his facility is $36.96 per diem. Under the former state plan the Apostolic Christian Home would be reimbursed at a rate of $41.10 per diem. This rate would have commenced on November 1, 1990. Because of the current rate freeze, Mr. Lehman calculates that his nursing facility will have a short fall of $32,000.00. He further testified that this shortfall could only be made up by decreasing staff and increasing the work load of the remaining staff members in order to come into compliance with federal mandates. Mr. Lehman estimated his facility will incur increased costs of $16,000.00 directly attributable to the minimum wage increase.

51. Ralph Garrison is the Administrator of Christ Villa, Inc. of Wichita, Kansas. Seventy percent of Christ Villa's residents are Medicaid recipients. Based upon a cost report filed after its fiscal year end on

September 30, 1990, Mr. Garrison estimates that under the previous state plan Christ Villa would be reimbursed at a rate of $58.73 per diem. Under the current rate freeze Christ Villa is reimbursed $51.77 per diem. In Mr. Garrison's opinion, Christ Villa will not be in business in September, 1991, if the current rate freeze is maintained.

52. Wes Worthington has been the Administrator of Sugar Valley Home, Inc. in Mound City, Kansas for the past 20 years. Based upon its most recent cost report, Mr. Worthington estimates that Sugar Valley Home would receive a $37.31 per diem rate of reimbursement under the former state plan. Under the current rate freeze, Sugar Valley Home, Inc. is receiving a $35.58 per diem rate of reimbursement. Mr. Worthington calculates the total loss to Sugar Valley Home will be $21,000. He further testified that his facility currently has employees which earn less than the federally mandated minimum wage which will go into effect on April 1, 1991. Mr. Worthington estimates the additional costs of the minimum wage increase to Sugar Valley Home, Inc. will total $11,037. According to Mr. Worthington, because 60% of Sugar Valley Home's residents are Medicaid recipients, and because Sugar Valley Home is located in a low income county with few private pay patients, Sugar Valley Home will not be able to continue in business if the current rate of reimbursement for Medicaid providers is maintained. The net effect on his facility will be the need to make personnel cuts and a resulting inability to comply with state and federal standards.

53. Increasing demands on nursing facilities which will be forced to cut their staffs will result in a decreased quality of care and a concomitant loss in reputation to those Medicaid providers.

54. Russ Ellora has been a reimbursement accountant for Medical Lodges, Inc. for the past seven years. Medical Lodges, Inc. is a corporation which has 23 nursing facilities in the state of Kansas. Mr. Ellora testified on behalf of plaintiffs as their expert witness. Mr. Ellora reviewed calculations for 46 different nursing facilities made by the late Lewis Allen, former Executive Vice President of the Kansas Health Care Association. The 46 nursing facilities were chosen because these facilities have filed cost reports since the implementation of the rate freeze. According to Mr. Ellora's testimony, 80% of the 46 facilities would have received a rate increase under the former state plan for Medicaid reimbursement. (Plaintiffs' Exh. 38). Under the rate freeze, Mr. Ellora predicted 36 out of the 46 facilities (78%) will not be reimbursed for their costs.

55. As of January 1, 1991, all but one of Medical Lodges, Inc.'s 23 facilities in Kansas will begin to lose money on services provided to Medicaid recipients. (Plaintiffs' Exh. 39). The total estimated impact of the rate freeze upon Medical Lodges, Inc. for the period of October 1, 1990, to September 30, 1991, is a decrease in reimbursement revenue in the amount of $739,611. (Plaintiffs' Exh. 39).

56. Mr. Ellora testified that his calculations and Mr. Allen's calculations were based upon cost reports which had not been subjected to a desk review or a field audit. However, Mr. Ellora also testified that audit adjustments are generally insignificant. By way of example, he testified that on the Schedule A–1 form for Sugar Valley Home, Inc. an audit adjustment of $1,400 had been made on a reported amount of $565,125. (Plaintiffs' Exh. 35).

## STANDING

As a preliminary matter, the court must address defendants' motion to dismiss. In their motion, defendants contend that this case must be dismissed because this action does not satisfy the requirements for a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure. In the alternative, defendants contend that the plaintiffs lack associational standing. Because we find the associational standing issue to be dispositive of defendants' motion, we will not address defendants' arguments directed at plaintiffs' alleged failure to satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure.

Plaintiffs seek to assert the rights of members of their associations. Ordinarily, a party may not assert the rights of others. *County Court of Ulster County v. Allen,* 442 U.S. 140, 154–163, 99 S.Ct. 2213, 2223–28, 60 L.Ed.2d 777 (1979). However, the Supreme Court has recognized associational standing in particular instances in which organizations assert the rights of their members. In determining whether plaintiffs have associational standing, the court must analyze the facts of this case under the test for associational standing as enunciated in *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211–12, 45 L.Ed.2d 343 (1975), and refined in *Hunt v. Washington State Apple Advertising Comm'n.,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). Accordingly, an association may have standing to assert the rights of its members when:

> (a) its members would otherwise have standing to sue in their own right;
>
> (b) the interests it seeks to protect are germane to the organization's purpose; and
>
> (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441.

■ Initially, the court finds that, pursuant to *Wilder v. Virginia Hosp. Ass'n.,* —— U.S. ——, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), the individual health care providers of the two plaintiff associations do have standing to challenge the method by which the state of Kansas reimburses providers under the Medicaid Act, 42 U.S.C. §§ 1396 *et seq.* Furthermore, this right is enforceable under 42 U.S.C. § 1983. *Id.* 110 S.Ct. at 2525. As provided under 42 U.S.C. § 1396a(a)(13)(A), health care providers are entitled to reimbursement according to rates that a "State finds, and makes assurances satisfactory to the Secretary, are rea-

sonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities...." Thus, the first prong of the standing test enunciated by *Hunt* is met in this case.

Secondly, the court finds that the interests which plaintiffs are seeking to protect, namely maintaining the quality and availability of adult care facilities by reasonable and adequate rates of reimbursement, is germane to the purposes of the two non-profit health care associations. Specifically, the stated purposes of the Kansas Health Care Association, Inc. contained in its articles of incorporation, of which this court takes judicial notice, include improving the standards, efficiency, and service in the operation of adult care facilities. Similarly, the articles of incorporation for the Kansas Association of Homes for the Aging, Inc. state that its purpose is to constitute an association of not-for-profit facilities providing long term care to the elderly. Thus, both organizations have the purpose of promoting the availability of long-term care for the elderly. Thus, the second prong for associational standing is also met.

Finally, the third requisite for associational standing is whether the claim asserted or the relief requested requires the participation of actual members in the lawsuit. Defendants contend that plaintiffs may not satisfy the third requirement under *Hunt* because the relief requested, a preliminary injunction, requires the participation of individual members to prove irreparable harm.[1] The court rejects defendants' assertion. The court finds that, the impact of an ˜underfunded budget may be demonstrated readily without the participation of individual health care providers. As supported by evidence contained in SRS's own documents, the loss of the current funding

---

**1.** In support of their argument, defendants cite *Northeastern Florida Chapter of Ass'n. of Gen. Contractors of Am. v. City of Jacksonville, Fla.,* 896 F.2d 1283 (11th Cir.1990). The court finds defendants' reliance on this case to be misplaced. First, the Eleventh Circuit Court of Appeals reversed the lower court because the district court issued a preliminary injunction without the receipt of any evidence on the issue of irreparable injury. *Id.* at 1286. Secondly, plaintiffs in *Northeastern Florida Chapter* did not allege nor present evidence of specific injuries other than monetary injuries which were capable of being remedied later by the award of damages. *Id.* Thus, defendants' arguments simply are not supported by *Northeastern Florida Chapter of Ass'n. of Gen. Contractors of Am.*

will be absorbed by providers who will have to cut costs which ultimately will affect the quality and availability of care received by Medicaid recipients.

Furthermore, the court finds defendants' reading of the three requirements of *Hunt* erroneous. Whether the plaintiffs have presented evidence of irreparable injury, as required for the granting of a preliminary injunction, is a requirement for determining whether the members of the plaintiff organizations would have standing to sue individually under the first prong of the associational standing test of *Hunt*. In order to assert associational standing, plaintiffs must present evidence which supports the conclusion that individual members would have standing to seek a preliminary injunction. As conceded by defendants in their motion to dismiss, individual members of the plaintiff organizations do have standing to challenge the state's implementation of a rate freeze pursuant to *Wilder*.

In regard to the final requirement which defendants allege is unsatisfied by the present case, the Supreme Court has stated that "[i]f in a proper case the association seeks a declaration, injunction or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind." *Warth,* 422 U.S. at 515, 95 S.Ct. at 2213.[2] Similarly, the requisites of associational standing for purposes of injunctive relief are satisfied by the plaintiffs in this action because it can reasonably be supposed that a preliminary injunction will inure to the benefit of the individual health care providers who may be injured by continuation of the current rate freeze.

---

**2.** The court further notes that proof of individualized injuries is usually necessary in actions seeking monetary damages, *e.g., Warth,* 422 U.S. at 515–16, 95 S.Ct. at 2213–14. Thus, the third prong of *Hunt* usually becomes problematic for associational standing in actions in which an

## PRELIMINARY INJUNCTIVE RELIEF

The grant of a preliminary injunction is within the sound discretion of this court. The standards which govern the granting of a preliminary injunction are well settled in this circuit. The moving party must establish:

(1) a substantial likelihood that he will eventually prevail on the merits;

(2) that he will suffer irreparable injury unless the injunction issues;

(3) that the threatened injury to him outweighs whatever damage the proposed injunction may cause the opposing party; and

(4) that the injunction, if issued, would not be adverse to the public interest.

*Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir.1980).

*A. Substantial Likelihood of Success on the Merits*

The requirement of proving a substantial likelihood of success on the merits may be satisfied by merely raising serious questions going to the merits, if the other three requirements for a preliminary injunction are satisfied. *Continental Oil Co. v. Frontier Ref. Co.,* 338 F.2d 780, 781–82 (10th Cir.1964). The court finds that plaintiffs have raised serious questions concerning whether Kansas' amended State Plan for Medicaid Reimbursement violates federal law. Title XIX of the Social Security Act, 42 U.S.C. § 1396 (1983), the Medicaid Act, authorizes federal grants to states for medical assistance to low-income persons who are aged. This federal program is funded by both the state and federal governments. Kansas participates voluntarily in this program. Consequently, Kansas must satisfy federal Medicaid laws and regulations in order to receive federal funds. *Amisub (PSL) v. State of Colo. Dept. of Social Serv.,* 879 F.2d 789, 794 (10th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990).

actual award of specific monetary relief is sought, or when there are diverging interests among members of the plaintiff organization. *See* 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3531.9, at 619–20 n. 145.

Among the requirements which must be met before a state may receive federal funds are those mandated by the Boren Amendment, 42 U.S.C. § 1396a(a)(13)(A). This provision requires a state to set rates of reimbursement for Medicaid providers which the state "finds" and "assures" are satisfactory to HCFA. Further, whenever a state amends its plan, it must once again make assurances and findings that its amended plan meets federal requirements. *Amisub*, 879 F.2d at 789. If a state fails to make the required findings and assurances, its state plan may be enjoined. *See Wilder*, 110 S.Ct. at 2523 n. 18; *Pinnacle Nursing Home v. Axelrod*, 719 F.Supp. 1173, 1183 (W.D.N.Y.1989); *Hillhaven Corp. v. Wisconsin Dept. of Health & Social Serv.*, 634 F.Supp. 1313, 1319 (E.D. Wis.1986). Thus, a state cannot implement a state plan, and later undertake a study after that plan has gone into effect.

Under the relevant portions of federal law rates must be:

> reasonable and adequate to meet the cost which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access (taking into account geographic location and reasonable travel time) to inpatient hospital services of adequate quality.

42 U.S.C. § 1396a(a)(13)(A). In this case, plaintiffs have raised serious doubts in regard to both the procedural aspects of the assurances made to HFCA and the substantive question of whether the rates established by the amendments to State Plan TN–90–44 and TN–90–06 set rates of reimbursement which are "reasonable and adequate" to meet the costs which must be incurred by "efficiently and economically" operated facilities. First, the court finds that the state has not conducted any studies to determine the actual costs of "efficiently and economically" operated facilities in order to determine whether the rates, as set, would cover those costs. Evidence presented at the hearing indicated that no studies have been conducted to determine what percentage of providers were actually receiving their costs at the time of reimbursement.[3]

Further, the court calls into question the state's findings which allegedly support Secretary Taylor's assurances that federal mandates required by OBRA '87 may be met under the state plan for reimbursement of these additional costs. Originally, SRS predicted that it needed in excess of $21 million in order for facilities to satisfy these federal mandates. Yet, the final budget allocation earmarked for these changes was under $3 million. Thus, plaintiffs have raised serious questions on the issue of whether the state's findings support the assurances procedurally required under federal law, specifically 42 C.F.R. § 447.255(b). Although Secretary Taylor testified that it is not unusual for a preliminary budget estimate to be off by $18 million, the court finds that this amount of a reduction raises a serious question as to the adequacy of the final allocated amount of less than $3 million. Thus, plaintiffs have raised serious questions as to whether the findings and assurances violate the procedural requirements of federal law. *See Amisub*, 879 F.2d at 797.

Secondly, the court finds that plaintiffs have raised serious questions regarding whether the rates under the current state plans are "reasonable and adequate." Under the Boren Amendment, states are required to pay reasonable and adequate

---

3. Additionally, no studies were undertaken to determine the disproportionate impact upon those providers serving primarily low income residents. The evidence presented reveals that the impact of the rate freeze would have a most profound effect on those providers who serve mostly Medicaid recipients. Specifically, administrators of two of the providers, namely Christ Villa, Inc. and Sugar Valley Home, Inc., testified that they essentially will be shut down if the rates established by the current plan are maintained. Thus, although the Secretary made assurances that there is no shortage of facilities in low-income areas, this assurance is based upon findings which have not taken into account the disproportionate impact upon those providers serving primarily Medicaid recipients.

rates of reimbursement to health care providers who participate in the Medicaid program and are in compliance with state and federal laws and regulations. By definition, a reasonable and adequate rate must cover the costs which efficiently and economically operated nursing facilities incur while serving Medicaid recipients. 42 U.S.C. § 1396a(a)(13)(A). When enacting the Boren Amendment, Congress did not intend to encourage "arbitrary reductions in payment that would adversely affect the quality of care." *Wilder,* 110 S.Ct. at 2520 (quoting S.Rep. No. 96–471, at 29 (1979)).

■ The court finds that there is ample evidence in the record that the rates under the rate freeze are not "reasonable and adequate." First, the record reflects that the cuts made between the preliminary budget request prepared by SRS and the final budget, contain cuts which were made simply to accommodate a failure to recommend and allocate a sufficient amount of funds. Specifically, testimony by Mr. Gump revealed that SRS knew that its budget was "underfunded." Further testimony by Mr. McDaniel revealed that the Kansas legislature chose not to fund the federally mandated minimum wage increases. The court finds that these exclusions and reductions were basically arbitrary, budget-driven cuts. These cuts include: elimination of the cost report effect; elimination of a specific allocation for meeting federal minimum wage requirements; and the reduction of funding necessary to comply with federal mandates contained in OBRA '87 (from over $21,000,000 to under $3,000,000). The record reflects that SRS knew that this would have a profound impact upon the quality and availability of care for Medicaid recipients. Because the rates of reimbursement do not take into account the state and federal mandates, the court finds that plaintiffs have raised a serious question as to the "reasonableness and adequacy" of the rates provided by the current rate freeze and plan for reimbursement of compliance with OBRA '87.[4] The

court finds that an alleged budget shortfall does not exempt Kansas from the necessity of complying with federal mandates. *See Wisconsin Hosp. Ass'n v. Reivitz,* 733 F.2d 1226, 1236 (7th Cir.1984). As stated by the Supreme Court, the "provision of federal funds is expressly conditioned on compliance with the Amendment and [HFCA] is authorized to withhold funds for noncompliance with this provision." *Wilder,* 110 S.Ct. at 2512. Accordingly, Kansas cannot simply fail to allocate sufficient funds which are necessary to comply with federal mandates.

The court further finds that plaintiffs have raised serious questions regarding the validity of the rate-setting methodology employed by SRS. Despite the fact that the rate setting formula is multifaceted, the primary consideration of this court must be whether the actual rates are "reasonable and adequate." *See Colorado Health Care Ass'n. v. Colorado Dept. of Social Serv.,* 842 F.2d 1158, 1167 (10th Cir.1988). However, if rates are based upon a combination of components which are not rationally related to Boren Amendment requirements, the logical result would be a final rate that fails to satisfy the Boren Amendment standards. *See West Virginia Univ. Hosp., Inc. v. Casey,* 885 F.2d 11, 28 (3d Cir.1989), *cert. granted,* —— U.S. ——, 110 S.Ct. 1294, 108 L.Ed.2d 472 (1990). In this case, SRS has failed to include certain federal mandates as components in its general rate-setting formula. Instead, these mandates have been treated separately and the amount allocated is extremely suspect in view of SRS's original estimates. Additionally, in its determining the general rates of reimbursement, SRS has employed an estimated inflation factor of 4.8% which does not accurately reflect the spiralling inflation of health care costs which have had an estimated rate of inflation of between 5 and 7.5% annually. Further compounding this effect, the inflation factor is not applied to many of the costs

---

4. The court further notes that in the 1992 budget request, SRS has prepared a budget which essentially eliminates the eligibility of between 3,400 and 3,600 currently eligible Medicaid re-

cipients. Thus, not only will the quality of care be affected dramatically, but the availability of care may be eliminated completely for some Medicaid recipients.

incurred by nursing facilities. Thus, the already low inflation factor is further reduced.

The conclusion that the combination of these factors has produced reimbursement rates which are not "reasonable and adequate" to cover the costs of "efficiently and economically" operated nursing facilities is supported further by the expert testimony of Russ Ellora. Mr. Ellora testified that under the current rates employed under the rate freeze, 36 out of 46 (78%) facilities which have filed cost reports since the implementation of the rate freeze will not receive their actual costs incurred while caring for Medicaid recipients. The court finds that this evidence supports the conclusion that plaintiffs have demonstrated serious questions, if not a substantial likelihood of success on the merits, on the issue of whether the rates set under the current rate freeze violate federal law.

### B. Irreparable Harm

■ The court finds that the members of the plaintiff associations and the Medicaid recipients will suffer irreparable harm if an injunction is not entered pending a full trial on the merits.[5] As supported by the record in this case, the impact of the rate freeze and schedule for reimbursement of OBRA '87 requirements will be felt most profoundly by individual providers who will be forced to absorb the difference between the actual costs of caring for Medicaid recipients and the rate of reimbursement employed by the state. Both Mr. Gump and Secretary Taylor testified that the differential will have to be absorbed by providers. Further, the record reflects that management decisions to cut costs may ultimately lower the quality and availability of health care to Medicaid recipients. As a result, providers will suffer harm to their reputations as quality health care providers. Indeed, the evidence revealed that some providers would no longer be able to stay in business.[6] A decline in the availability and quality of care available to Medicaid recipients constitutes irreparable harm. *See Children's Memorial Hosp. v. Illinois Dept. of Pub. Aid,* 562 F.Supp. 165, 174 (N.D.Ill.1983).

Furthermore, the harm suffered by individual providers may not be redressed by the award of monetary relief. The Eleventh Amendment to the United States Constitution precludes the awarding of retrospective monetary relief against a state, absent a waiver of the state's immunity. *Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974). In this case, Kansas has not waived its immunity. Thus, irreparable harm will be suffered if prospective injunctive relief is not granted. *See Wilder,* 110 S.Ct. at 2523 n. 8 (injunctive relief is appropriate).

### C. Balancing the Harm

The harm to plaintiffs, if the injunction were not granted, would be the potential underreimbursement of Medicaid providers. This underreimbursement could ultimately lead to the closing of some facilities and the loss of reputation to those facilities which are unable to maintain quality care. The harm to Medicaid recipients is the potential loss of eligibility and a decline in the quality and availability of nursing facilities. The magnitude of the harm to the Kansas nursing facility industry cannot be predicted at this time. However, competent evidence presented at the hearing leads to the conclusion that those facilities which serve primarily Medicaid recipients would suffer the most. As a result, a shortage of facilities for Medicaid recipients is likely to result.

In contrast, if a preliminary injunction were granted, the harm to defendants would be minimal. Defendants would be forced to reimburse Medicaid providers under the former state plan methodology. Further, if defendants were to prevail in this action, any overpayments could be re-

---

**5.** Medicaid providers have standing to challenge Medicaid plans on behalf of Medicaid recipients. *See Colorado Health Care Ass'n.,* 842 F.2d at 1164 n. 5.

**6.** This factor alone constitutes irreparable harm. *See Illinois Hosp. Ass'n. v. Illinois Dept. of Public Aid,* 576 F.Supp. 360, 370 (N.D.Ill.1983).

couped pursuant to K.A.R. 30–10–18(f). Defendants argue that because defendants must look to each facility to recoup any overpayments and not to plaintiffs, the burden on defendants outweighs the potential harm to plaintiffs. The court is unpersuaded by defendants' argument. This harm pales in contrast to the potential threat to Medicaid recipients and providers who may suffer permanent injury from a denial of a preliminary injunction. Defendant further argues that if an injunction were issued, other SRS programs will suffer due to the unavailability of funding. While not passing upon the sufficiency of funding for other SRS programs, the court finds that the potential harm to elderly Kansans is great. Most, if not all, of the Medicaid recipients are unable to care for themselves. Under federal law, these recipients are entitled to a certain level of care. A state simply cannot excuse itself from satisfying federal mandates on the basis of a budget shortfall. *Wisconsin Hosp. Ass'n.*, 733 F.2d at 1235. In conclusion, the court finds that the harm to plaintiffs and Medicaid recipients outweighs the harm to defendants.

*D. The Public Interest*

■ The court finds the issuance of a preliminary injunction will not adversely affect the public interest. Indeed, plaintiffs are seeking to compel compliance with public policy as expressly codified by Congress in the Boren Amendment. Clearly, the state of Kansas has elected to participate in the Medicaid program; thus, Kansas has chosen to be bound by federal mandates which accompany the allocation of federal funds.

Plaintiffs have adequately satisfied the four elements necessary for a preliminary injunction. Therefore, plaintiffs' request for a preliminary injunction will be granted.

IT IS BY THE COURT THEREFORE ORDERED that defendants' motion to dismiss for lack of standing is denied.

IT IS FURTHER ORDERED that plaintiffs' motion for a preliminary injunction is granted.

The court orders:

Defendants Kansas Department of Social and Rehabilitation Services and Dennis R. Taylor, Acting Secretary of the Department of Social and Rehabilitation Services, are enjoined from implementing and maintaining the October 1, 1990 Medicaid reimbursement rate freeze contained in State Plan TN–90–44. Defendants are further enjoined from implementing the reimbursement schedule for satisfying OBRA '87 requirements contained in State Plan TN–90–06. Defendants are further enjoined from reimbursing Medicaid providers at rates which are not in compliance with standards set by federal law consistent with the above order.

MEMORANDUM AND ORDER

This matter is before the court on motion of defendant Kansas Department of Social and Rehabilitation Services (hereafter "SRS") to alter, amend, or clarify this court's order entered December 31, 1990, pursuant to Rules 59(e) and 65(d) of the Federal Rules of Civil Procedure.[1] In the December 31, 1990 order the court preliminarily enjoined defendants from using two state plans, namely TN–90–06 and TN–90–44, to calculate reimbursement rates for nursing facilities which participate in the Medicaid program. Defendants were further enjoined from reimbursing Medicaid providers at rates which are not in compliance with federal law.

Essentially, defendants are asking the court to reconsider its December 31, 1990 order. Whether to open and amend a judgment is a decision committed to the sound discretion of this court. *McCarthy v. Manson*, 714 F.2d 234, 237 (2d Cir.1983).[2] De-

---

1. The court notes that the Secretary of the Department of Social and Rehabilitation Services has not joined in this motion. Nonetheless, the court will proceed to address this motion as if

the Secretary had been a party to defendant SRS's motion.

2. Although the granting of a preliminary injunction is not a final judgment, it is an appealable

fendants suggest that while the order granting plaintiffs' motion for a preliminary injunction appears to comply with Rule 65(d) of the Federal Rules of Civil Procedure, SRS is unable to obey the injunction because it needs more guidance than is provided in the order.

■ The court finds defendants' argument to be without merit. The court has expressly preliminarily enjoined the reimbursement of Medicaid providers at rates established pursuant to two state plans, TN–90–06 and TN–90–44. The court finds no ambiguity in its order language. Further, the court declines to advise SRS what rate of estimated inflation to apply. *See American Trucking Ass'n., Inc. v. I.C.C.*, 669 F.2d 957, 961 (5th Cir.), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 493 (1983), (court declined to advise the I.C.C. as to the legality of proposed rules of the I.C.C.).

Defendant further contends that because it has been enjoined from reimbursing Medicaid providers at rates set in State Plan TN–90–06, it is caught in a "Catch–22" situation. Defendant's alleged dilemma centers around its concern that it will be subject to sanctions by the Health Care Financing Administration (hereafter "HCFA") for failing to compensate providers who satisfy federal mandates or to contempt proceedings in this court for reimbursing providers pursuant to TN–90–06.

■ The court finds defendants' argument to be without merit. Defendant may reimburse providers for compliance with federal mandates prior to approval by HCFA. Pursuant to 42 C.F.R. §§ 447.-256(c) and 430.20(b), defendants may submit a plan for approval to HCFA, and the effective date of the plan will relate back to

the first day of the calendar quarter during which the plan was submitted. Thus, prior approval of the amended state plan is not a prerequisite to reimbursing facilities which satisfy federal mandates. Accordingly, compliance with the court's order will not result in SRS being subject to sanctions by the HCFA.[3]

■ Finally, defendant seeks clarification as to whether the injunction applies to reimbursement for services rendered after December 31, 1990, or to all payments made after December 31, 1990. Defendant contends that the Eleventh Amendment of the United States Constitution prohibits the application of the injunction to reimbursement payments for services rendered prior to December 31, 1990.

The eleventh amendment bars a "federal court from awarding retroactive relief— damages to compensate past injuries— when those damages will be paid by the state treasury." E. Chemerinsky, *Federal Jurisdiction* § 7.5, at 349. *See e.g., Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). In this case, the injury suffered by providers from reimbursement at an inadequate rate occurs at the time of reimbursement, not at the time services are rendered. Accordingly, the eleventh amendment does not preclude the injunction from applying to all reimbursement payments made after the entry of the injunction on December 31, 1990.[4] Accordingly, defendants' motion will be granted only with regard to clarification of the prospective effect of the preliminary injunction.

IT IS BY THE COURT THEREFORE ORDERED that defendants' motion to alter, amend or clarify this court's order is

---

order. 28 U.S.C. § 1292(a)(1). *See* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2948, at 426. Thus, the court may properly address defendant's motion pursuant to Rule 59(e) of the Federal Rules of Civil Procedure.

3. Further, defendants' argument that the court has effectively overturned HCFA's administrative determination in regard to State Plan TN–90–06 is without merit. In determining whether to approve a state plan, the HCFA only evaluates

the adequacy of the assurances made by the state agency. *See Wilder v. Virginia Hosp. Ass'n.*, —— U.S. ——, 110 S.Ct. 2510, 2516, 110 L.Ed.2d 455 (1990) (citing 42 C.F.R. § 447.256(2) (1989)). Thus, the adequacy of the findings may be reviewed by this court.

4. In contrast, this court may not redress those injuries suffered by providers who have already been reimbursed pursuant to the enjoined state plans.

granted in part and denied in part, consistent with the above opinion.