**ARKANSAS MEDICAL SOCIETY, INC., et al., Plaintiffs,**

v.

**Jack REYNOLDS, Director, Department of Human Services, State of Arkansas, Defendant.**

**No. LR–C–92–429.**

United States District Court, E.D. Arkansas, W.D.

April 20, 1993.

---

Michael W. Mitchell, and David L. Ivers, Mitchell, Blackstock, Simmons, and Barnes, Little Rock, AR, for plaintiffs.

Debby Thetford Nye, Chief Counsel, DHS Office of Chief Counsel, Little Rock, AR, for defendant.

## MEMORANDUM OPINION AND ORDER

SUSAN WEBBER WRIGHT, District Judge.

■ To balance Arkansas' Medicaid budget in fiscal year 1993, the Arkansas Department of Human Services (DHS) reduced reimbursement rates to various Medicaid providers by 20% and implemented certain cost-sharing provisions. The plaintiffs, who include both Medicaid providers and recipients, filed suit under 42 U.S.C. § 1983 claiming these actions violate federal Medicaid laws under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* For the reasons that follow, the Court finds the reduction in reimbursement rates and implementation of the cost-sharing provisions are not in accordance with the requirements of the federal Medicaid laws and, therefore, are invalid.[1]

### I.

Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, commonly known as the Medicaid Act, is a federal-state cooperative program designed to provide medical assistance to persons whose income and resources are insufficient to meet the costs of medical care. The program is financed by both the federal and state governments. Under this system of "cooperative federalism," if a State agrees to establish a Medicaid plan that satisfies the requirements of Title XIX, which include several mandatory categories of health services, the federal government agrees to pay a specified percentage of the total amount expended as medical assistance under the State plan. *Harris v. McRae*, 448 U.S. 297, 308, 100 S.Ct. 2671, 2683–84, 65 L.Ed.2d 784 (1980) (citation omitted). A state's participation in the Medicaid program is voluntary, but once a state chooses to participate it must comply with federal statutory and regulatory requirements. *Id.* at

1. DHS again raises the issues of jurisdiction and standing. For the reasons set forth in the Court's Orders dated August 18, 1992 and November 5, 1992, the Court finds that, pursuant to 42 U.S.C. § 1396a(a)(30)(A) (Supp.1992) (the "Equal Access" provision), plaintiffs have enforceable rights under 42 U.S.C. § 1983, and that each of the plaintiffs has standing. DHS also contends this action should have proceeded as a class action. However, no useful purpose would be served by requiring this case to proceed in such a manner as all individuals who are not a part of this action but who are similarly situated will have the benefit of this Court's ruling finding the reduction in reimbursement rates and implementation of the cost-sharing provisions to be invalid. *Cf. Craft v. Memphis Light, Gas and Water Division*, 534 F.2d 684 (6th Cir.1976), *aff'd*, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978).

301, 100 S.Ct. at 2680; *Weaver v. Reagen,* 886 F.2d 194, 197 (8th Cir.1989).

The Department of Health and Human Services (HHS) is the federal agency charged with administering the federal Medicaid program and has delegated much of this responsibility to the federal Health Care Financing Administration (HCFA). To qualify for federal reimbursement, the Medicaid Act requires each state to submit its Medicaid plan to the federal government, specifically HCFA, for approval. 42 U.S.C. § 1396a. This plan "is a comprehensive written statement submitted by the agency describing the nature and scope of its Medicaid program and giving assurance that it will be administered in conformity with the specific requirements of title XIX, the regulations in ... Chapter IV [of the Code of Federal Regulations], and other applicable official issuances of the Department." 42 C.F.R. § 430.10. HCFA's review is of a cursory nature. The agency reviews only the state's assurances. It does no substantive review of its own and does not require states to submit findings or underlying data. *AMISUB (PSL) v. Colorado Dept. of Social Services,* 879 F.2d 789, 800 (10th Cir.1989), *cert. denied,* 496 U.S. 935, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990).

Each state's Medicaid program, if it elects to have one, must be administered by a single state agency. 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10. DHS, formerly under the direction of Jack Reynolds,[2] is the state agency responsible for administering the Medicaid program in the State of Arkansas. The Division of Economic and Medical Services is the division within DHS directly responsible for administering the state's medical assistance programs, including the Medicaid program. The Director of the Division is Kenny Whitlock, and the Director of the Medicaid program is Ray Hanley, who reports to Mr. Whitlock.

## II.

Plaintiffs claim that DHS violated the procedural and substantive requirements of federal law and the Administrative Procedure Act under Arkansas law. Plaintiffs seek injunctive, declaratory and other appropriate relief restraining DHS from imposing any reduction in reimbursement rates to physicians and other noninstitutional health care providers and from imposing any cost-sharing (co-payment or co-insurance) on Medicaid recipients. Plaintiffs also seek mandatory injunctive relief requiring DHS to develop standards and methods to be used in setting payment rates to assure that payments to health care providers are consistent with federal law.

Following a hearing on July 20, 1992, this Court issued a verbal order enjoining DHS from implementing the 20% reduction in reimbursement rates (which became effective on July 1, 1992) with respect to obstetrical and pediatric care, and in speech, physical, and occupational therapy for children pending a trial on the merits. The Court subsequently issued an order incorporating the verbal order in writing and denying DHS's motion for reconsideration. *See* Memorandum and Order, August 18, 1992. Additional hearings to determine whether the preliminary injunction should be extended to other areas of the Medicaid program were held on August 18 and 19, 1992. By Memorandum and Order dated November 5, 1992, the Court declined to extend the injunction to other areas.

The trial on the merits began on November 30, 1992 and concluded on December 3, 1992. Although the Court previously declined to extend the injunction, the Court's task at this point is different. The Court must now determine whether, as a final matter, DHS is in violation of the federal Medicaid laws.

## A.

■ As a preliminary matter, the Court addresses DHS's claim that this matter is moot with respect to the areas of obstetrics and pediatrics. Two days before the trial on the merits, DHS informed plaintiffs that it had withdrawn the plan imposing a 20% cut

---

**2.** On March 12, 1993, Mr. Reynolds resigned as Director of DHS, citing differences with Governor Jim Guy Tucker over the manner in which DHS is to be operated. Richard Howell, Deputy Director of DHS, has been named interim Director until a successor can be found.

on obstetrical and pediatric services, apparently because of a letter from HCFA expressing concern over the rate reduction in these areas. *See* Plaintiff's Exhibit 68. In the letter, HCFA requested "additional or clarifying information" from DHS concerning, *inter alia,* any adverse affect on provider participation. *Id.* As a result of HCFA's concerns, DHS, in a letter dated November 25, 1992, requested to withdraw State Medicaid Plan TN 92–30 (which reflects the revisions in obstetrical and pediatric payment rates). *See* Defendant's Exhibit 115. In addition, Mr. Hanley stated at trial that DHS has no plans to again seek a reduction in reimbursement rates in these areas. DHS argues that in withdrawing TN 92–30, the issue of reducing obstetrical and pediatric payment rates became moot. The Court disagrees.

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Steele v. Van Buren Public School Dist.,* 845 F.2d 1492, 1494 (8th Cir.1988) (quoting *Powell v. McCormack,* 395 U.S. 486, 496–97, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969)). DHS's withdrawal of TN 92–30 and its disavowal of intent to seek a 20% reduction in reimbursement rates with respect to obstetrical and pediatric services is not sufficient to moot the case as to these areas.

> [V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.,* does not make the case moot. A controversy may remain to be settled in such circumstances, *e.g.,* a dispute over the legality of the challenged practices. The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion.

*Steele,* 845 F.2d at 1494 (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 632–33, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)). *See also City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal

court of its power to determine the legality of the practice").

While a case may nevertheless be moot if the defendant can demonstrate that "there is no reasonable expectation that the wrong will be repeated," the defendant's burden "is a heavy one." *Steele,* 845 F.2d at 1494 (quoting *United States v. W.T. Grant Co.,* 345 U.S. at 632–33, 73 S.Ct. at 897). Here, DHS has not met its burden. DHS maintains the continuing authority to seek an amendment to the state plan to reduce reimbursement rates for obstetrical and pediatric care. DHS's withdrawal of TN 92–30 would thus not preclude it from later seeking a reduction in payment rates for these services by submitting an amendment to the plan with the same or similar deficiencies (which will be discussed *infra* ) should the Court accept DHS's mootness argument. Indeed, notwithstanding testimony to the contrary, Mr. Whitlock's November 25 letter to HCFA indicates that DHS plans to again seek a reduction in obstetrical and pediatric reimbursement rates:

> In response to your letter dated September 21, 1992, and following the program staff's telephone conversations, it has been determined that currently we do not have access data to demonstrate access patterns as your office is requiring to support the use of these geographic regions. *We will develop supplemental data to cover this and it will be part of future submissions of obstetrical [and] pediatric payment rates.*

Defendant's Exhibit 115 (emphasis supplied).

Because DHS's intentions with respect to reimbursement rates in the areas of obstetrics and pediatrics are ambiguous, and considering the continuing ability of DHS to amend the plan, the Court does not find this matter to be moot.

### B.

Plaintiffs raise two interrelated federal claims which this Court finds are meritorious. They allege the Medicaid reimbursement and cost-sharing provisions were set solely on the basis of budgetary consideration without regard to federal requirements and that these actions were arbitrary, capricious, and contrary to law. In reviewing

non-adjudicatory agency actions,[3] the court must determine whether the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Friedman v. Perales,* 668 F.Supp. 216, 221 (S.D.N.Y.1987) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 414, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971)), *aff'd,* 841 F.2d 47 (2nd Cir.1988); *Weaver, supra,* 886 F.2d at 197. Review under the "arbitrary and capricious" standard is narrow, and a court may not substitute its judgment for that of the agency. *Motor Vehicle Manufacturer's Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). The standard of review is highly deferential, presuming the agency actions to be valid "so long as they are 'rationally connected to relevant factors or data' and do not conflict with a controlling statute or regulation." *Folden v. Washington State DSHS,* 744 F.Supp. 1507, 1525 (W.D.Wash.1990) (citations omitted), *aff'd,* 981 F.2d 1054 (9th Cir.1992); *AMISUB (PSL), supra,* 879 F.2d at 800 (citation omitted). *See also Illinois Health Care Ass'n v. Bradley,* 776 F.Supp. 411, 417 (N.D.Ill.1991) (noting that a state Medicaid plan is a product of both state and federal agency action and, thus, must be reviewed with the deference that is accorded federal agency actions), *aff'd,* 983 F.2d 1460 (7th Cir.1993); *Friedman,* 668 F.Supp. at 221 (same). Nevertheless, the Court is still obliged "to engage in a substantial inquiry." *Citizens to Preserve Overton Park, Inc.,* 401 U.S. at 415, 91 S.Ct. at 823. It is not " 'limited to rubber stamping agency action,' and the scope of review includes a determination whether the [state] plan complies with the requirements of federal law." *Illinois Health Care Ass'n,* 776 F.Supp. at 417 (citation omitted). In this respect, while states are accorded wide latitude in formulating

specific Medicaid plans, a state agency acts arbitrarily if it fails to base its decision on the proper consideration of the relevant data or factors. *Friedman,* 668 F.Supp. at 221; *Folden,* 744 F.Supp. at 1525. This Court must therefore determine whether the agency action at issue in this case was based upon "a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc.,* 401 U.S. at 416, 91 S.Ct. at 824; *AMISUB (PSL),* 879 F.2d at 800.

1.

■ The Supreme Court has suggested that a court considering challenges to agency rate-settings must treat as "relevant factors" those factors "relevant to choosing a rate that will best serve the purposes of [an applicable] statute." *American Paper Inst. v. American Elec. Power Serv. Corp.,* 461 U.S. 402, 413, 103 S.Ct. 1921, 1928, 76 L.Ed.2d 22 (1983). In this case, such factors are found in 42 U.S.C. § 1396a(a)(30)(A), the subsection of the Medicaid Act underlying this lawsuit. This provision requires that Medicaid payments be sufficient to "assure that payments are consistent with efficiency, economy and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area."[4] The corresponding federal regulation, 42 C.F.R. § 447.204, employs essentially the same language. These provisions function, *inter alia,* to prevent gross disparity between the availability of services available under the plan to Medicaid patients and its availability to those who can afford to pay privately. *King by King v. Sullivan,* 776 F.Supp. 645, 655 (D.R.I.1991) (citing *Clark v. Kizer,* 758 F.Supp. 572, 576 (E.D.Cal.1990)).

---

**3.** This case involves rule-making as opposed to adjudication. Rule-making is the agency process for the formulation, amendment, or repeal of a "rule," *i.e.,* "any agency statements of general applicability and future effect that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice of any agency." Ark.Code Ann. § 25–15–202(4) and (5) (Repl.1992). This is in contrast with "adjudication," which means the agency process for the formulation of an "order," *i.e.,* "the final

disposition of an agency in any matter other than rule making, including licensing and rate making . . ." Ark.Code Ann. § 25–15–202(6) and (7).

**4.** Under 42 U.S.C. § 1396r–7 (Supp.1992), Medicaid agencies must make special assurances to HCFA that their payment rates are sufficient to enlist enough providers of obstetrical and pediatric services to meet the requirements of 42 U.S.C. § 1396a(a)(30)(A).

With the requirements of 42 U.S.C. § 1396a(a)(30)(A), Congress established an unambiguous statutory obligation for states participating in the Medicaid program to establish a procedurally sound rate setting methodology which considers the relevant factors of efficiency, economy, quality of care, and equal access. There can be no doubt of Congress's intent in this regard given the plain reading of this provision. The provision is cast in mandatory rather than precatory terms, providing that the State plan "*must* ... provide such methods and procedures" to assure that payments are consistent with efficiency, economy, quality of care, and equal access (emphasis added).[5] *Cf. Wilder v. Virginia Hospital Assn.,* 496 U.S. 498, 512, 110 S.Ct. 2510, 2518–19, 110 L.Ed.2d 455 (1990). Such mandatory language reflects Congress's concern and recognition that "Medicaid participation of physicians generally, and obstetricians and pediatricians in particular is inadequate," and that "without adequate payment levels, it is simply unrealistic to expect physicians to participate in the program." H.R.Rep. No. 101–247, 101st Cong., 1st Sess. 390, *reprinted in* 1989 U.S.Code Cong. & Admin.News 1906 at 2115–16.

In finding that there is a binding obligation on states to utilize methods and procedures which consider the relevant factors set forth in 42 U.S.C. § 1396a(a)(30)(A), the Court reaches a conclusion that is entirely consistent with the numerous cases that have invalidated rate reductions because the state did not make the findings required by the federal Medicaid laws. *See, e.g., Nebraska Health Care Ass'n, Inc. v. Dunning,* 778 F.2d 1291 (8th Cir.1985) (invalidating HCFA's approval of "cap" on reimbursement where sufficient findings were not made, therefore no factual basis for "assurances" made to HCFA), *cert. denied,* 479 U.S. 1063, 107 S.Ct. 947, 93 L.Ed.2d 996 (1987); *AMISUB (PSL), supra,* 879 F.2d 789 (invalidating Colorado plan cutting provider reimbursement 46% across the board because the State had not made any findings that its rates were "reasonable and adequate" and because the State conceded

that the adoption of its "Budget Adjustment Factor" which divided the median cost of care in half had absolutely no relevance to the costs of an efficient hospital); *Temple University v. White,* 941 F.2d 201 (3rd Cir. 1991) (invalidating 14% rate reduction based on a "budget neutrality adjustment," for failure to comply with 42 U.S.C. § 1396a(a)(13)(A)), *cert. denied,* —— U.S. ——, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992); *Missouri Health Care Ass'n v. Stangler,* 765 F.Supp. 1413 (W.D.Mo.1991) (invalidating plan that failed to make findings which identify and determine whether reimbursement rates are reasonable and adequate to meet the reasonable costs that must be incurred by Medicaid facilities); *Multicare Medical Center v. State of Wash.,* 768 F.Supp. 1349 (W.D.Wash.1991) (finding Washington Medicaid Plan and its subsequent amendments to be in violation of the procedural provisions of the federal Medicaid laws for failure to make required findings and assurances that the payment rates are reasonable and adequate to meet the costs that must be incurred by economically and efficiently operated providers). *See also Wilder,* 496 U.S. at 520 n. 18, 110 S.Ct. at 2523 n. 18 (noting that if a State errs in finding that its rates meet the requirements of the Medicaid Act or in supplying assurances to that effect to the Secretary, a provider is entitled to have the court invalidate the current state plan and order the State to promulgate a new plan that complies with the Act). These cases are uniform in holding that payment rates must be based upon a consideration of the factors mandated by the federal Medicaid laws.

Although these cases involved challenges to the adoption of institutional payment rates (thus necessitating a review of the specific statutory and regulatory requirements pertinent to the adoption of such rates), the same analysis used by these courts is equally applicable to an analysis of the noninstitutional rates involved in this case. Two recent decisions, *Ohio Hospital Association v. Ohio Department of Human Services,* 62 Ohio St.3d 97, 579 N.E.2d 695 (1991), *cert. denied,* ——

---

5. Of course, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v.*

*Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).

U.S. ——, 112 S.Ct. 1483, 117 L.Ed.2d 625 (1992), and *Orthopaedic Hospital v. Kizer,* CV 90–4209 SVW (JRX), 1992 WL 345652 (C.D.Cal. Oct. 5, 1992), address this point.

In *Ohio Hospital Association* the Supreme Court of Ohio upheld a lower court decision invalidating the State's decision to reduce reimbursement rates for outpatient services because it was implemented without due consideration of its effect on the quality of care, as required by 42 U.S.C. § 1396a(a)(30)(A). The Court recognized the close analogy between the institutional rate setting cases, as represented by *Wilder,* and the obligations of the State Medicaid programs with respect to noninstitutional care:

> The court [in *Wilder*] held that the language of the [Boren] Amendment is mandatory rather than precatory, and that the receipt of federal funds is expressly conditioned on compliance with the Amendment. *Id.* at [512], 110 S.Ct. at 2519, 110 L.Ed.2d at 469. The Boren Amendment states that "the state plan '*must*' 'provide for payment * * * of hospital(s)' according to rates the State finds are reasonable and adequate." *Id.* (quoting Section 1396a(a)(13)(A)). Section 1396a(a)(30)(A) ... contains similar mandatory language.

*Id.,* 62 Ohio St.3d at 102, 579 N.E.2d at 698.

The court concluded that "[t]he same reasons relied on by the United States Supreme Court in *Wilder* support a decision that ODHS violated Section § 1396a(a)(30)(A) by basing its decision solely on budgetary reasons." *Id.*

Similarly, in *Orthopaedic Hospital* the U.S. District Court for the Central District of California analyzed a series of outpatient rates set by the California Department of Health Services (Department) to determine whether the Department considered all "relevant factors" in establishing the rates. The Court determined that Congress expressed a clear intention in 42 U.S.C. § 1396a(a)(30)(A) that Medicaid payment rates be consistent with efficiency, economy, and quality of care, and that these factors must therefore be treated by the court as the factors relevant to choosing a rate that will best serve the purposes of 42 U.S.C. § 1396a(a)(30)(A). *Id.,* 1992 WL 345652, at *4 (citing *American*

*Paper Inst., supra,* 461 U.S. at 413, 103 S.Ct. at 1928). The court concluded that the Medicaid rate setting methodology employed by the Department violated 42 U.S.C. § 1396a(a)(30)(A) because it failed, for the most part, to consider the relevant factors of efficiency, economy, and quality of care, and that the majority of the rates set by the Department therefore were set in an arbitrary and capricious fashion. *Id.* at *12–13.

As these cases make clear, the state must consider, on the basis of some reasonably principled analysis, the substantive requirements of 42 U.S.C. § 1396a(a)(30)(A) in setting its payment rates. *Cf. Wilder,* 496 U.S. at 519, 110 S.Ct. at 2522 ("the statute and regulation set out factors which a State must consider in adopting its rates"). The state's payment rates are not proper if the methods and procedures it utilizes in formulating its rates, rather than being bona fide and objective, is merely an exercise to make the best case to support the state's rates, and the state considers only factors favorable to its position while failing to consider the relevant factors. *California Hosp. Ass'n v. Schweiker,* 559 F.Supp. 110, 117 (C.D.Cal.1982), *aff'd without opinion,* 705 F.2d 466 (9th Cir.1983). *See also Illinois Hosp. Ass'n v. Illinois Dept. of Pub. Aid.,* 576 F.Supp. 360, 371 (N.D.Ill. 1983) ("By tieing payment rates solely to state budgetary needs, [the Illinois Department of Public Aid] has totally ignored the federal mandate that rates must be adequate to assure Medicaid beneficiaries reasonable access to hospital services of adequate quality, Section 1396a(a)(30)").

Accordingly, the Court will treat efficiency, economy, quality of care, and equal access—what Congress clearly intended payment rates to comport with—as relevant factors, *see Orthopaedic Hospital,* CV 90–4209 SVW (JRX), 1992 WL 345652, at *4, and determine whether DHS considered these factors in its decision to reduce reimbursement rates by 20% and implement the cost-sharing provisions at issue in this case, and whether there is a "rational basis" between these factors and DHS's actions. *Id.; Folden, supra,* 744 F.Supp. at 1525.

## 2.

■ DHS officials realized in the fall of 1991 that they were going to experience shortfalls in the Medicaid budget for fiscal years 1992 and 1993. In response, DHS officials made four major reductions in the Medicaid program as follows:

On December 1, 1991, DHS eliminated benefits for adults 21 and older for the following services: psychology, occupational, physical and speech therapy, chiropractic and dental. Outpatient hospital services were reduced to 12 per year. Allowable physician visits (which were defined to include medical doctors, dentists, podiatrists and optometrists) were reduced to 12 per year. *See* Exhibit 18 to Plaintiffs' Brief in Support of Motion for Preliminary Injunction.

On January 1, 1992, DHS reduced personal care benefits for adults to 50 hours per month; reduced home health benefits for adults to 25 visits per year; and reduced benefits for lab and x-ray services to $500. *See* Exhibit 19 to Plaintiffs' Brief in Support.

On May 1, 1992, DHS reduced the Medicaid eligibility limit for pregnant women and infants from 185% to 133% of the federal poverty level. *See* Exhibit 20 to Plaintiffs' Brief in Support.

On July 1, 1992, DHS reduced by 20% the reimbursement rates to physicians and other noninstitutional providers. *See* Plaintiffs' Exhibit 105–106.

Each of these actions was implemented using the emergency provision of the Arkansas Administrative Procedure Act, Ark.Code Ann. § 25–15–204(b).

The 20% cut in noninstitutional rates was announced to the media in a press release on June 16, 1992 as follows: "Rich Howell, interim director, of the Arkansas Department of Human Services (DHS), announced today that strong measures will be needed to balance Arkansas' Medicaid budget in fiscal year 1993, which begins on July 1, 1992." *See* Exhibit 1 to Plaintiffs' Brief in Support; Plaintiffs' Exhibit 44. *See also* Plaintiffs' Exhibit 55 (legal notice published in the newspaper which states that "[t]he proposed change in reimbursement rates is due to budgetary constraints"). To make up a $60 million projected shortfall in the Medicaid budget, DHS announced changes that included the 20% cut, which was designed to save $33 million a year. In the press release, DHS also announced plans to implement by September 1, 1992 a cost-sharing provision requiring Medicaid recipients to pay up to 5% of their Medicaid services. After this lawsuit was filed DHS decided to implement a 2% cost-sharing provision instead.

The press release and legal notice published in the newspaper and with the Secretary of State all listed only one reason for these actions—budgetary considerations. DHS offered little else in terms of the relevant factors. Indeed, DHS "readily admits that [it] would not have made the reduction in rates but for the need to balance the budget." Defendant's Reply to Plaintiffs' Post Trial Brief, at 14. Such an admission, by itself, is sufficient for the Court to invalidate these actions for failure to consider the relevant factors. However, DHS goes on to assert, without citation of authority, that "it is lawful for the decision to be based 90% or 95% upon the issue of budget and still be permissible." *Id.* Such an assertion reflects a misunderstanding by DHS of its obligations under the federal Medicaid laws.

■ Certainly, DHS may legitimately take state budgetary factors into consideration when developing its reimbursement methodology. *See Illinois Hosp. Ass'n, supra,* 576 F.Supp. at 371. What it may not do, however, is flout the Medicaid Act's requirements in order to suit state budgetary needs. *Id.* (citing *Alabama Nursing Home Ass'n v. Harris,* 617 F.2d 388, 396 (5th Cir.1980)). That is exactly what DHS has done here. Mr. Whitlock and Mr. Hanley have admitted that DHS did no studies or analyses before implementing the cut. While Mr. Hanley has testified that he was aware that rates in other states were lower than those in Arkansas and had been approved by HCFA, he admitted that he did not know what the participation rates were in these other states. Moreover, he could point to nothing in federal law that allows states to use comparisons

with other states as a justification for setting rates at a particular level.

DHS took the actions at issue in this case without considering whether they had any relevance to the requirements of 42 U.S.C. § 1396a(a)(30)(A). In fact, the cost-sharing provisions were intended to have a *deterrent* effect. *See* Plaintiffs' Exhibit 46 (a memo dated June 2, 1992 from Mr. Whitlock to Richard Howell in which it is estimated the "co-payment deterrent factor" will save approximately $3.1 million); Exhibit 11 to Plaintiffs' Brief in Support (a budget status report dated June 24, 1992 estimating costs associated with the "Co–Pay Deterrent factor"); Plaintiffs' Exhibit 79 (a memo dated May 21, 1992 from former Director Terry Yamauchi to then Lt. Governor Jim Guy Tucker estimating savings associated with the co-pay deterrent factor). DHS also ignored warnings by its own officials, Mr. Whitlock and former Director Yamauchi, that these actions could have a serious impact on providers and many of the most vulnerable clients that DHS serves. *See* Plaintiffs' Exhibit 46 (stating "[t]hese. cuts will have critical 'costs' associated with them in terms of reduced client services and provider relations," and "many of these proposed reductions will severely impact our most vulnerable clients and/or our previous commitments to provider groups"); Plaintiffs' Exhibit 79 (same). Given this knowledge, DHS was required to make some factual inquiries as to the impact of making the 20% cut and its effect on the requirements of 42 U.S.C. § 1396a(a)(30)(A). *Multicare Medical Center, supra,* 768 F.Supp. at 1394. The record in this case is blatantly devoid of any effort by DHS to consider the relevant factors. *Cf. AMISUB (PSL), supra,* 879 F.2d at 800.

Because the relevant factors were not considered, it follows that these factors did not in any way form the basis for the decision to reduce reimbursement rates by 20% and implement the cost-sharing provisions. There thus being no "rational connection" between these actions and the relevant factors, *see Folden, supra,* 744 F.Supp. at 1525, the Court concludes that DHS's actions were arbitrary and capricious, *see Orthopaedic Hospital, supra,* CV 90–4209 SVW (JRX),

1992 WL 345652, at *12–13, and that plaintiffs have proven their claims by a preponderance of the evidence. *Folden,* 744 F.Supp. at 1525.

3.

■ In reviewing the state's Medicaid plan, if a court concludes that the state has failed in its obligation to consider the requirements of the Medicaid Act, the court may invalidate the state action without reviewing substantive compliance. *Orthopaedic Hospital, supra,* CV 90–4209 SVW (JRX), 1992 WL 345652, at *13; *Wilder, supra,* 498 U.S. at 520 n. 18, 110 S.Ct. at 2523 n. 18. *See also Asarco, Inc. v. U.S.E.P.A.,* 616 F.2d 1153, 1160 (9th Cir.1980) (stating that "[i]f the court determines that the agency's course of inquiry was insufficient or inadequate, it should remand the matter to the agency for further consideration and not compensate for the agency's dereliction by undertaking its own inquiry into the merits"). For the reasons previously stated, the Court finds and concludes that the overwhelming evidence shows that DHS did not employ a procedurally sound methodology which considered the relevant factors of efficiency, economy, quality of care, and equal access, and that DHS's actions therefore were arbitrary and capricious.

■ Although plaintiffs have offered extensive and persuasive evidence relating to the rate's impact on access, the state is in the best position to determine the statewide impact of the payment reduction. For Medicaid recipients and providers to assess the program-wide impact of a rate-setting methodology after its implementation is a daunting task which should be unnecessary if the state has initially satisfied its obligations. *Cf. Missouri Health Care Ass'n, supra,* 765 F.Supp. 1413 (noting that without proper findings, it is impossible to determine whether the reimbursement rate is reasonable and adequate to meet the reasonable costs that must be incurred by Medicaid facilities). Certainly, no Medicaid recipient or provider is well equipped to develop the data relevant to determining compliance with 42 U.S.C. § 1396a(a)(30)(A). *See Clark, supra,* 758 F.Supp. at 576–78 (setting forth the factors used by the Secretary of HHS and the courts

in measuring compliance with the equal access provision). For these reasons 42 U.S.C. § 1396a(a)(30)(A) requires that the state maintain both a procedurally sound methodology as well as achieve the mandated results of efficiency, economy, quality of care, and equal access.

### III.

 In sum, the Court finds that the budget-driven reduction in reimbursement rates and implementation of the cost-sharing provisions are invalid under federal law. The Court recognizes, however, the importance of stability in the Medicaid program and that *immediate* invalidation of the reimbursement rates and cost-sharing provisions would have painful consequences not only for DHS, but quite possibly for Medicaid recipients as well, *e.g.*, through the curtailment of optional (but nevertheless meaningful) programs for certain categories of recipients. Accordingly, the Court does not immediately prohibit usage of the invalid reimbursement rates and cost-sharing provisions, but orders DHS to establish, within 120 days of the date of entry of this order, a plan that is based upon the mandated factors.

IT IS SO ORDERED.